The CITY OF CHICAGO, a municipal corporation, Plaintiff,

v.

RELIABLE TRUCK PARTS CO., INC., Dave Kaplan, Leroy Kaplan, Edward R. Brandwein, and William Koehler, Defendants.

No. 88 C 1458.

United States District Court, N.D. Illinois, E.D.

March 30, 1993.

Kelly Raymond Welsh, Mary Frances Harkenrider, Stuart D. Fullerton and Stanley Arthur Berman, City of Chicago, Law Dept. Corp. Counsel, Judson H. Miner, Davis, Miner, Barnhill and Galland, P.C., Chicago, IL, for City of Chicago, IL.

George Carter Lombardi, Dan K. Webb, Winston & Strawn, Stuart Philip Krauskopf, Cassiday, Schade & Gloor, Alan Rosen, Norman Terry Finkel, Marcia Topper Wolf, Young, Hauslinger and Rosen, Ltd., Marilyn I. Kosin, Towbin & Zazove, Ltd., Chicago, IL, for defendants.

### *MEMORANDUM AND ORDER*

MORAN, Chief Judge.

Plaintiff, the City of Chicago (the City), brings this action under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.*, against defendants, Reliable Truck Parts Co., Inc. (Reliable), Dave Kaplan, Leroy Kaplan, Edward R. Brandwein (Brandwein) and William Koehler (Koehler), alleging that defendants instituted and conducted a scheme to defraud plaintiff by overcharging it for various auto parts and miscellaneous supplies. In addition, the amended complaint alleges pendent state claims for breach of contract, common law fraud and an accounting. Defendants have also filed a counterclaim against plaintiff for recovery on unpaid invoices. Before us now are defendants' and plaintiff's cross-motions for summary judgment on the amended complaint and on Reliable's counterclaim; and plaintiff's motion to strike defendants' motion for summary judgment and to preclude introduction of evidence by defendants. For reasons as stated below, the

parties' motions are granted in part and denied in part.

### FACTS

The complaint alleges that Reliable and certain of its officers and employees defrauded the City by charging inflated prices for truck parts. From the inception of this litigation the allegations made by the City in this civil suit have also been the subject of a grand jury investigation targeting the defendants. All of the individual defendants have asserted their Fifth Amendment privileges against self-incrimination. Included below is a brief recitation of facts that have been stated in detail in prior memoranda and orders, as well as additional facts that are relevant to the motions now at hand.[1]

Pursuant to various contracts, Reliable supplied the City's Departments of Police, Fire, Water, Public Works, Aviation, Sewers, and Streets and Sanitation with automobile parts and various other miscellaneous supplies between January 1978 and September 11, 1987. The contracts specify that the price charged for a particular item be ascertained from current manufacturers' list prices, and that the price lists, catalogs and invoices describing the manufacturers' part numbers, list price and applicable discount should be provided to the City. The contracts which are at issue in this lawsuit have been attached, in whole or in part, as exhibits.

According to the City, from October 1978 until September 1987 Reliable mailed them invoices containing false information. The prices charged and the part numbers included on the invoices allegedly diverged from the actual manufacturers' list. On or about December 29, 1986, defendant Koehler mailed to the City what purported to be the master price list of all parts from all manufacturers from whom the City would order items through its contracts with Reliable. The City alleges that this list included false information in that it contained only certain parts supplied by a single manufacturer and that the prices included on the list were inflated over the manufacturers' actual list prices.

In addition to goods sold to the City pursuant to written contracts, the City purchased other items from Reliable between 1978 and 1987. Several of the City's employees testified that, in practice, when an employee in one of the using departments needed parts he or she would telephone a vendor with whom the City had some written contract (*i.e.* Reliable) and order the needed part (Skipton dep. at 39–46; Calhoun dep. at 81–83; Bannister dep. at 77–78; Jennings dep. at 57–59). According to the City, any of its employees who ordered goods from Reliable not covered by a written contract, were acting in an unauthorized manner and therefore were not agents of the City. The City maintains that in some of the written contracts there were provisions allowing for the sale of non-specified auto parts.

The invoices that Reliable submitted to the City were accompanied by a City form, called a CP–45, that specified the contract under which the payment was sought, and which included a signed certification by Reliable that the pricing was in accordance with the contract. The CP–45s were approved by the purchasing agent for the City, wherein the City certified that it examined the CP–45s and attached invoices and that the prices stated therein were correct.

The City discontinued payments to Reliable on September 11, 1987. There are outstanding invoices due to Reliable for goods that were received by the City.

The City has calculated that it paid $4,986,318.77 to Reliable during the years 1978–1987. Reliable alleges that totalling the invoices in its possession, it charged a total dollar amount of $3,537,343.74 to the City between 1978 and 1987. In order to estimate the total overcharge, the City examined a sample of invoices from the more than 9,900 invoices submitted by Reliable during the relevant period. Ted Marszalek (Marszalek), Deputy Comptroller for the City, prepared a report (the City's report) summarizing the damages. Marszalek reviewed 418 invoices and determined the percentage overcharge on those invoices. He then averaged those percentage overcharges to obtain an average overcharge payment. According to

---

1. These prior rulings were issued on November 21, 1988 and March 30, 1989.

the City's report, the average overcharge on the surveyed invoices was 28% of the amount billed. The City then extrapolated this sample percentage to the total invoices and arrived at a total overcharge amount of $1,396,-169.26 from 1978 through 1987.

Reliable disputes the City's sampling technique and disagrees with the City's estimated overcharge amount. The parties agree that Marszalek did not perform a perfect random sampling of the invoices and did not perform various statistics tests in performing his analysis. Marszalek analyzed only those invoices where he was able to determine what part was referenced in the invoice and what the correct price was for that part. Furthermore, Marszalek assumed a 50% discount for certain parts when he was unable to find the invoice item specified in the written contract.[2]

### DISCUSSION

#### I. Plaintiff's Motion to Strike

The City moves to strike defendants' motion for summary judgment and for an order precluding defendants from offering evidence to oppose the City's motion for summary judgment because the individual defendants asserted their Fifth Amendment privilege and therefore have not answered discovery requests concerning these same facts.

As a corporate defendant Reliable does not have a Fifth Amendment privilege. While the court agrees that Reliable has not been able to reply to the City's discovery requests fully, it has responded as best it could, given the circumstances, and is not in violation of any court order regarding discovery.[3] Reliable has provided a significant amount of evidence to the City and the City has attached and relies on much of this evidence in its motion for summary judgment. Reliable is therefore entitled to support its motion and oppose the City's motion by offering evidence, other than privileged testimony.

The individual defendants are in a somewhat different position. This court has previously upheld the individual defendants' rights to assert their Fifth Amendment privileges.[4] Throughout the history of this case the individual defendants have consistently asserted their privileges and have refused to respond to any of the City's discovery requests. Although the individual defendants have been well within their rights, the City is correct in pointing out that in this civil case they cannot use the Fifth Amendment as both a sword and a shield. The individual defendants cannot hide behind the protection of the Fifth Amendment as to their contentions and later attempt to offer privileged testimony disputing the City's evidence or supporting their own defenses. S.E.C. v. Benson, 657 F.Supp. 1122, 1129 (S.D.N.Y. 1987). However, the defendants have not offered any privileged testimony or affidavits, but instead rely only on those documents previously produced in the course of this litigation.[5] The individuals are not therefore abusing their Fifth Amendment privilege but are merely asserting their legitimate right to attack the City's case with evidence that is in the record. To "forbid the defendant[s] from submitting any evidence in rebuttal, when the [plaintiff] has submitted volumes of exhibits in support of its motion, would prove here too 'costly' a price" for the defendants' proper assertion of

---

2. The City notes that one of the written contracts states that it covers non-specified parts and that the discount on such parts will be 50%. The City admits, however, that the written contracts generally called for specified discounts from manufacturer's list price, or some other specified price list, and that the discounts range from 0% to well over 50%. According to the City, on every part where Marszalek assumed a 50% discount, Reliable had specified a 50% discount on the invoice that it submitted to the City.

3. As ordered by this court, Reliable provided a company representative to answer questions in a deposition regarding the contracts and the activities at Reliable. Again, this is not the best source of information, but it is a reasonable alternative given that the individuals' Fifth Amendment privilege must be honored. Reliable has not and should not be punished for its inability to respond 100% to discovery.

4. This suit was also the subject of a grand jury investigation targeting the individual defendants.

5. The plaintiff does not dispute the fact that defendants have only submitted and relied on evidence that has been produced or made available to the City.

their privilege. *S.E.C. v. Rehtorik*, 135 F.R.D. 204, 206 (S.D.Fla.1991).

■ The City argues that defendants should be precluded from offering *any* evidence to support their motion or to rebut the City's motion. We believe that this would impose too harsh a penalty on a defendant who asserts his Fifth Amendment privilege and then is inevitably faced with losing any civil case where the plaintiff moves for summary judgment. While the individuals who have asserted their Fifth Amendment privilege cannot now submit their own testimony or affidavits, any evidence that has been provided or made available to the City is fair game to all parties.[6]

## II. *Defendants' Motion for Summary Judgment*

Defendants move this court for summary judgment, alleging that (1) the City has not established the existence of damages and therefore has failed to make out an essential element of its fraud, contract and RICO claims; (2) there were items sold to the City pursuant to oral contracts, and such items should be excluded from the City's claims since it cannot apply the terms of some alleged written contract not covering the ordered merchandise or apply other terms not agreed to by the parties; (3) the City cannot establish its claims with respect to alleged contracts numbered 9853, 9139, 8182, and 8972 because it has failed to either produce executed copies, or establish certain terms of those alleged contracts; (4) since Koehler was not employed by Reliable until 1984, the City has not and cannot make out any claims against him for the years 1978–1983; and (5) as to its counterclaim, Reliable seeks recovery on unpaid invoices for merchandise that was sold and delivered to the City.

### A. Damage issues

■ The City seeks to recover for alleged overcharges on merchandise sold to it by

Reliable, based on breach of contract, fraud and RICO theories. Each of these causes of action requires the City to prove the fact of injury. On the other hand, it is the trier of fact's obligation to determine what calculation of damages to apply and the amount of damages can be estimated on any reasonable basis. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 564, 51 S.Ct. 248, 251, 75 L.Ed. 544 (1931) (holding that where a party establishes the fact of damage, the facts and circumstances of the case can be put before the jury in order to enable them to estimate and fix the amount of damages to be awarded); *U.C. Castings Co. v. Knight*, 754 F.2d 1363, 1374 (7th Cir. 1985) (noting that only a reasonable basis of computation is required for the submission of the question of damages to the jury).

Defendants seem to be confusing the fact that the plaintiff must establish evidence of the *existence* of an injury, as opposed to proving the actual amount of damages. Ironically, the cases defendants cite say as much. *West v. The Western Casualty & Surety Co.*, 846 F.2d 387, 393 (7th Cir.1988) (stating that with regard to fraud, plaintiff must prove that it was damaged because of reliance on false statements); *Robinson v. City Colleges of Chicago*, 656 F.Supp. 555, 561 (N.D.Ill.1987) (holding that under RICO plaintiff must prove an injury because of violation of statute); *Mannion v. Stallings & Company, Inc.*, 204 Ill.App.3d 179, 149 Ill. Dec. 438, 442, 561 N.E.2d 1134, 1138 (1990) (noting that breach of the terms of contracts must establish evidence of damages resulting from the breach).

■ Although the City's damage calculation is by no means precise, it has put forth enough evidence to demonstrate that it was injured by defendants' alleged fraudulent conduct. Marszalek found invoices where the price charged by Reliable was greater than what he calculated to be the correct

---

6. We note that since the City will be permitted to draw adverse inferences from defendants' refusal to respond to legitimate discovery requests, *City of Chicago v. Reliable Truck Parts Co.*, 768 F.Supp. 642, 647 (N.D.Ill.1991), it would be difficult for defendants to be successful on any motion for summary judgment that they might bring. Because of this ability to draw negative

inferences there will almost always be a genuine issue of material fact. *But see Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992) (stating that negative inference drawn from the assertion of the Fifth Amendment is not enough to preclude entry of summary judgment).

invoice price according to manufacturers' price lists, and as provided in the contract. The City, therefore, proved injury—overcharges on invoice items—in accordance with its fraud and contract theories. In fact, defendants essentially admit that the plaintiff provided evidence to prove *some* injury. For instance, defendants recalculated the amount of overcharge from Marszalek's 1978–1982 sample and came up with a 2.4% overcharge, as compared to the City's 27.9% calculated overcharge (def. memo at 11). Thus, defendants also calculated overcharge on the invoices.

Defendants, in essence, dispute the extrapolation and accuracy of the total damage amount when they question the plaintiff's sampling process and lack of statistical reliability. However, they have neither presented evidence to rebut nor do they seem to contest the fact that the plaintiff has shown an injury. At this stage of the game it is not the amount of damages that concerns us, but whether the plaintiff has met its burden by providing sufficient evidence to establish the existence of an injury from defendants' alleged acts. The City has met its burden and summary judgment is denied on the damage issue raised by defendants.

### B. Merchandise Not Sold Pursuant to Written Contracts

■ Defendants argue that "certain merchandise" sold to the City between 1978 and 1987 was not sold pursuant to any of the alleged written contracts but, instead, was sold in accordance with oral agreements. Defendants maintain that "the City cannot attempt to apply the terms of some alleged written contract not covering the ordered merchandise," and request that judgment be entered in their favor as to those "non-contract" purchases.

Defendants rely on the testimony of several City employees to support their theory that, in practice, when an employee needed a part not covered by a contract, he or she would telephone one of the vendors with whom the City had a written contract (*e.g.* Reliable) and order the needed part. The City does not deny the fact that some items it purchased from Reliable were not sold pursuant to written contracts. However, the City points to evidence demonstrating that

Reliable referred to contract numbers on the invoice forms for those "non-contract" purchases. For example, plaintiff refers to an invoice (# 89723) that was identified by defendants as a "non-contract" purchase (def. stmt. of facts, appdx. to Adler rep. at 191). Although this was an alleged "non-contract" item, Reliable specified on the CP–45 invoice form that the invoice was being submitted pursuant to "contract No. 52406" (cplt. ex. L). Thus, even assuming that defendants were correct in their assertion that the part on this invoice was not covered by a written contract, Reliable indicated on the form that the part was covered by a contract. Accordingly, once the defendants cited to and certified that the invoice was rendered in accordance with a contract, the defendants were then bound by the terms of the referred-to contract.

The City maintains and has put forth evidence indicating that all of the invoices alleged to be "non-contract" purchases referred to a written contract on the invoice form. And it is reasonable to assume that when Reliable denoted a contract on the invoice form it would follow the terms of the contract, and, further, that it would be held to the relevant contract specifications. Defendants' motion for summary judgment as to "non-contract" purchases is denied, and such items remain part of the plaintiff's lawsuit.

### C. Contracts Numbered 9853, 8182, 9139 and 8972

Defendants argue that since the plaintiff has not produced executed copies or established the certain terms of contracts numbered 9853, 8182, 9139 and 8972, that summary judgment should be granted as to the claims related to those contracts. We disagree.

■ The City has provided complete copies of contracts numbered 9139 and 8972 (plf. exs. to stmt of undisputed facts). It has also attached the affidavit of Howard Henneman (Henneman) attesting to the fact that the documents are "true and complete cop[ies]" of those contracts. Therefore, the City has met its burden as to contracts 9139

and 8972 by establishing the existence and the certain terms of those contracts.

■ With respect to contract number 8182, the City has attached a copy of what Henneman attests to be a true and complete copy of the CN form executed by the City for the contract. While sections of the contract are missing, Henneman stated in his affidavit that various sections of contract 8182 were essentially identical to the same sections of contract numbered 8972. There is enough evidence to demonstrate not only the existence of contract 8182, but also evidence sufficient to establish the terms of the contract.

The City has attached copies of various documents relating to contract 9853. These documents provide sufficient evidence to establish the existence of contract 9853 as well as the certain terms of the contract. Again, Henneman attests that the attached documents are true and complete copies and that the missing sections are essentially identical to contract 8972.

■ Defendants argue that because Henneman's affidavit is not based on personal knowledge, it should be stricken. Defendants base their argument on the fact that Henneman was not responsible for executing or signing the contracts and, because he did not see the contracts until years after they were executed, he could not verify the execution of the documents. We disagree with defendants and hold that Henneman's statements are based on sufficient personal knowledge to support the attestations made in his affidavit. Henneman was employed in the Department of Purchases, Contracts and Supplies for the City from 1975 until 1985. From 1980 through 1984 he was assigned to the drafting and oversight of contracts relating to the purchase of automotive parts and other materials for use in the City's automobile shops. He has been involved in all stages of the contracting process between the City and Reliable and as a result of his employment is familiar with the City/Reliable contracts. Defendants imply that in order for Henneman to have personal knowledge of the contracts, he must have been personally involved with the execution or signing of the contracts. Such a requirement would be ludicrous, given that many documents are years old and with the passage of time the persons involved in the actual drafting and execution will not be around to personally testify as to the details of the contract. Henneman's employment experience and familiarity with the City's contracts with Reliable more than adequately qualify him to testify as he did in his affidavit.

The City has sufficiently established the existence and certain terms of contracts 9853, 8182, 8972 and 9139. Defendants' motion for summary judgment relating to these contracts is denied.

### D. Partial Summary Judgment in Favor of William Koehler

■ William Koehler was not employed by Reliable until 1984. The City has not and cannot establish that during the years 1978 through 1983 Koehler breached any contracts or committed any fraud upon the City. Summary judgment is therefore entered as a matter of law in favor of Koehler on all counts of the City's amended complaint for the years 1978–1983.[7]

### E. Defendants' Counterclaim

Both Reliable and the City seek summary judgment on the counterclaim filed by Reliable against the City. The parties agree that there are unpaid invoices due from the City to Reliable for merchandise that was delivered to and received by the City. Reliable argues that because it has fulfilled its contractual obligation to the City by delivering non-defective goods as ordered, the City must meet its contractual duty and pay for the goods. The plaintiff argues that it has no obligation to pay those invoices because Reliable has not shown that it had submitted proper invoices to the City in accordance with the conditions precedent for payment set forth in the contract. In addition, the City maintains that Reliable cannot benefit from the contract (*i.e.* be paid by the City)

---

7. The City has not put forth any evidence and does not seem to dispute the defendants' position concerning Koehler.

since it materially breached the contracts when it submitted fraudulent invoices.

 Although, generally, Reliable would be correct in arguing that its right to payment accrued once conforming goods were delivered to the City, an exception to the rule exists when either a condition precedent has not been fulfilled or when the party has materially breached the contract. *John J. Calnan Co. v. Talsma Builders, Inc.*, 77 Ill.App.3d 221, 32 Ill.Dec. 695, 699, 395 N.E.2d 1076, 1080 (1979) (holding that right to payment does not accrue until condition precedent has been fulfilled); *Robinhorne Construction Corp. v. Snyder*, 113 Ill.App.2d 288, 297, 251 N.E.2d 641 (1969) (noting that "where a party has materially breached a contract, he cannot take advantage of terms of the contract which benefit him"). The plaintiff asserts that Reliable used fraudulent pricing on the invoices for which it now seeks payment and argues that submission of false invoices constitutes a material breach of contract. We agree with the plaintiff's argument and because there is a genuine question of material fact as to whether Reliable submitted false invoices, Reliable is not entitled to payment on those items at this time.[8]

### III. *Plaintiff's Motion for Summary Judgment*

The City moves for summary judgment against defendants for several reasons. First, the City claims that summary judgment should be granted on its RICO claims because it has made out the essential elements of the RICO claims and because the undisputed facts demonstrate (1) that Reliable reinvested its fraudulently obtained income in itself and is therefore liable under § 1962(a); (2) that each of the individual defendants knowingly and willfully participated in the conduct of the affairs of the enterprise through a pattern of racketeering, violating § 1962(c); (3) that defendants are liable under § 1962(d) because they knowingly and willfully conspired to violate the sub-

stantive RICO provisions. Second, the City moves for summary judgment on its pendent state claims and maintains that it has established all elements of the common law fraud and breach of contract claims. Finally, the City seeks summary judgment on defendant's counterclaim.[9]

### A. RICO Claims

The plaintiff alleges RICO violations under subsections (a), (c), and (d) of § 1962. Subsection (a) makes it unlawful for any person who has received income from a pattern of racketeering income to invest the proceeds of such income in the establishment, operation or acquisition of an interest in an enterprise that is engaged in or affects interstate commerce. Under § 1962(c) it is unlawful for any person employed by or associated with an enterprise to conduct or participate in the affairs of the enterprise through a pattern of racketeering. Any person who conspires to violate the provisions of subsections (a), (b) and (c) is in violation of § 1962(d). All subsections of § 1962 have in common three fundamental elements. For each subsection there must be a "person", an "enterprise", and a "pattern of racketeering activity." *R.E. Davis Chemical Corporation v. Nalco Chemical Co.*, 757 F.Supp. 1499, 1507 (N.D.Ill.1990).

Defendants argue that the City has not demonstrated the "pattern of racketeering" element of its RICO claims. In order to prove a pattern of racketeering activity a plaintiff must show racketeering predicate acts that are related and that amount to or pose a threat of continuing criminal activity. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989).

#### 1. *Predicate Acts of Mail Fraud*

 The City charges defendants with mail fraud in violation of 18 U.S.C. § 1341. Violations of mail fraud statutes, as predicate acts under RICO, require the plaintiff to

---

8. Reliable argues that the City cannot dispute the prices charged for non-contract goods and maintains that many of the unpaid invoices pertain to those items. Given our comments in section II.B. of this opinion, we dismiss this argument and put those "non-contract" items in the same pool with the other invoices.

9. Both Reliable's and the City's motions concerning the Reliable's counterclaim are addressed in Section II. E. above.

show by a preponderance of evidence that defendants acted with a specific intent to defraud. *United States v. Garver*, 809 F.2d 1291, 1299 (7th Cir.1987); *Associates in Adolescent Psychiatry v. Home Life Insurance Co. of New York*, 751 F.Supp. 727, 729 (N.D.Ill.1990).

 The City alleges that there "can be no question that defendants' undisputed use of the dummy part numbers and prices on the invoices they submitted to the City was intended to defraud the City" (plf. memo at 15). However, the evidence put forth by the plaintiff is not so compelling as to preclude a reasonable person from finding that defendants did not intend to defraud the City. While the City has provided evidence as to how the individual defendants participated in the alleged fraud, each of those individual's actions are not necessarily indicative of their specific intent to deceive the City. For example, the City provides evidence that demonstrates that Koehler prepared the invoices from 1984 through 1987, and that Brandwein signed invoice certifications and provided price lists to the City. In addition, it has shown that Leroy Kaplan supervised much of Reliable's ongoing business and that Dave Kaplan ran the company for years. While the actions of the defendants demonstrate that they participated in the alleged fraudulent scheme, they do not necessarily indicate their intent to defraud. A reasonable person could find that the defendants were performing their jobs without knowing how their piece of the job fit into the overall alleged scheme and that they were merely performing their assigned tasks, or, for that matter, a reasonable person could conclude that the defendants had merely made mistakes.

While intent can be demonstrated by actions, it remains the City's duty to provide sufficient evidence to prove that defendants possessed specific intent to deceive. That is by no means an easy task and it is because of its difficulty that questions of intent and motive are particularly inappropriate for disposition on summary judgment. *Askew v. Bloemker*, 548 F.2d 673, 679 (7th Cir.1976). The City has not demonstrated that defendants committed predicate acts of mail fraud necessary for summary judgment of the RICO claims.

### 2. The Continuity Element of the "Pattern of Racketeering"

Defendants argue that the City's claims do not rise to the level of racketeering activity sufficient to support its RICO claims. They argue that the City has not proven a pattern of racketeering because it has alleged a single scheme with a single victim, and damages that are economically identical. Defendants contend, in essence, that the City has failed to establish the continuity prong of the pattern requirement.

 Since *H.J. Inc.*, it has been very difficult for plaintiffs to satisfactorily demonstrate continuity. *Midwest Grinding Co. Inc. v. Spitz*, 769 F.Supp. 1457, 1464 (N.D.Ill. 1991) (noting that the Seventh Circuit has not found continuity in any case since *H.J. Inc.*). Continuity exists where either there has been repeated conduct over a closed period of time or where the racketeering activity, by its nature, projects into the future with a threat of repetition. *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. at 2901. The plaintiff must show criminal activity which presents a significant societal threat of continuing criminal activity. *Id.* at 243 n. 4, 109 S.Ct. at 2902 n. 4; *U.S. Textiles, Inc. v. Anheuser–Busch Companies*, 911 F.2d 1261, 1267 (7th Cir.1990).

 While this court previously held that the allegations made in plaintiff's complaint were sufficient to withstand a motion to dismiss, the evidence now before this court is not enough to meet the pattern requirement necessary to support the City's motion for summary judgment. The relevant factors to consider when examining the pattern requirement are as follows: (1) the number and variety of acts and length of time over which they are committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries. *Triad Associates, Inc. v. Chicago Housing Authority*, 892 F.2d 583, 594 (7th Cir.1989), *cert. denied*, 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990).

The first factor concerns the number of acts and the period of time over which they occurred. The City has demonstrated that thousands of invoices were mailed by defen-

dants in furtherance of their alleged fraudulent scheme over a period of ten years.

Second, although the only victim of the fraud is the City, a reasonable person could consider there to be several victims since seven of the City's departments were involved in the alleged scheme. (Factor (2) above).

The third factor concerns the presence of separate schemes. Plaintiff argues that defendants' repeated acts of mail fraud constituted separate schemes to defraud the City. Each act involved separate purchases, often by separate City departments, and were separate enough in time "to be fairly viewed as separate transactions." *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986). Although plaintiff's argument is persuasive, a reasonable person could also conclude that there was only one fraudulent scheme involved: Reliable fraudulently inflating the prices on their invoices for goods sold to the City (factor (3)).

Finally, we look to the fourth factor, the occurrence of distinct injuries. The plaintiff's injuries are arguably distinct since each time the City purchased an item from Reliable it was allegedly submitted an invoice with a false price.

A scheme to defraud seven departments over a period of ten years, through thousands of invoices, would likely constitute a "pattern of racketeering." However, the evidence is not so convincing that a reasonable person would have to find a pattern to exist. Therefore, we leave that question to the trier of fact.

### B. Common Law Fraud

The City claims that it is entitled to summary judgment on its common law fraud claim because all elements of the claim have been established by clear and convincing evidence. In order to establish common law fraud the plaintiff must prove that defendants knowingly made false statements of material fact with the intention that the City rely on them; and that the City did in fact justifiably rely on the statements and was damaged by its reliance. *Western Casualty,* 846 F.2d at 393. As the plaintiffs point out, the intent to mislead is essential to the intentional tort of fraud. *Szajna v. General Motors Corp.,* 115 Ill.2d 294, 104 Ill.Dec. 898, 911, 503 N.E.2d 760, 773 (1986). The plaintiff relies on the individual defendants' conduct to demonstrate intent—"the careful preparation of falsely priced invoices and [defendants'] methodical use of the dummy price list over a ten-year period with the submission of thousands of invoices, belie any possible defense of inadvertence" (plf. memo at 22).

As discussed in the RICO section above (A. 1), it is very difficult for a plaintiff to win a motion for summary judgment when the element of intent is involved, and even more difficult in a common law fraud case where fraud must be shown by clear and convincing evidence. We do not consider the evidence so convincing that a reasonable person could not find that defendants did not intend to mislead the City. We agree with plaintiff in that intent can be demonstrated from the actions of defendants. However, the defendants' actions in this case do not clearly demonstrate, as a matter of law, that they intended to mislead the City. A reasonable person could conclude that the defendants were not aware of the ramifications of their individual actions, or that defendants made mistakes, or that they were performing their jobs as ordered and were not intending to deceive the City.

In accordance with our position in the RICO section above, the City has not conclusively demonstrated that defendants possessed the specific intent to deceive the City. We therefore do not grant plaintiff's motion for summary judgment on its common law fraud claim.[10]

### C. Breach of Contract

The City claims that it is entitled to summary judgment on its breach of contract

---

**10.** Defendants also raise the issue of reliance. They argue that because the City was provided with all of the price lists, it had ample opportunity to discover the invoice misstatements and therefore its reliance on Reliable's alleged misstatements is not justified. Although it is unfor-

tunate that the City did not discover the pricing misstatements earlier, any contributory negligence on its behalf is not a defense to intentional fraud. *Astor Chauffeured Limousine v. Runnfeldt Investment Corp.,* 910 F.2d 1540, 1549 (7th Cir. 1990).

claim against defendants. To prevail on its breach of contract claim, the City must establish the existence of a contract between itself and defendants; full performance by the City; the fact of defendants' breach; and the existence of damages to the City which resulted from the breach. *Quake Construction Inc. v. American Airlines*, 181 Ill. App.3d 908, 130 Ill.Dec. 534, 536, 537 N.E.2d 863, 865 (1989).

■■■ The City has established the first two elements necessary to prevail on a breach of contract claim. It has attached and proven the existence of written contracts between the City and Reliable. (City stmt. of undisputed facts, ex. H).[11] Defendants argue that the written contracts upon which the City relies cannot be considered "contracts" because they are not supported by consideration. They maintain that the contracts are illusory since they do not require the City to purchase any goods, or require Reliable to sell any goods. Generally, defendants would be correct in that contracts for the sale of goods that do not state a quantity term are unenforceable. Ill.Ann.Stat. ch. 26, ¶ 2–201(1); *Zayre Corporation v. S.M. & R. Co., Inc.*, 882 F.2d 1145, 1154 (7th Cir.1989). However, contracts that do not satisfy that writing requirement would nevertheless be enforceable if the City had fully performed all of its contractual obligations. Ill.Ann. Stat. ch. 26, ¶ 2–201(3)(c); *Zayre*, 882 F.2d at 1155. And the City has met its obligations since it accepted and paid for all goods it received from Reliable, except for those items that are the subject of Reliable's counterclaim. Thus, the contracts are enforceable with respect to those goods that the City has paid for and accepted.

■■■ Defendants next argue that even if the contracts were binding agreements, the City and Reliable modified them when City employees telephoned Reliable "to negotiate prices." Defendants maintain that the City "orally agreed upon prices for the merchandise as to both non-contract merchandise and merchandise covered under the alleged con-tracts." Under Illinois law, parties may orally modify a written contract. *Consolidated Bearings Co. v. Ehret—Krohn Corp.*, 913 F.2d 1224, 1231 (7th Cir.1990). However, there are several problems with defendants' position that its alleged conversations with City employees constituted modifications to the contracts. First, defendants' argument is based on the fact that these City employees (who have not been identified) were acting as agents of the City with authority to bind the City to an oral modification of the contract. Even assuming that these City employees did negotiate prices on the contracts, that fact alone is not enough to bind the City to an alleged price modification. There is no evidence indicating that those individuals were acting in the capacity of agents for the City. Furthermore, it is difficult to conceive that Reliable considered that various City employees in the using departments had the authority to modify prices in the contracts or to bind the City to new contracts. The second, and more apparent, weakness in defendants' argument is that Reliable consistently referred to written contracts on the CP–45 forms that it submitted to the City along with the invoices.[12] Reliable attested that the invoices were in accordance with those written contracts and thereby incorporated the contract terms (including the price terms) into the invoice. Reliable did not refer to any "oral modifications" on the invoices, but merely cited to the written contract. There is no evidence before us to raise a genuine issue of material fact as to whether oral modifications were made to the written contracts.

■■■ The City has established the fact that Reliable breached its contract with the City. From 1978 until 1987, Reliable supplied the City with various auto parts, tools and miscellaneous supplies pursuant to contracts between Reliable and the City. The contracts, which do not vary significantly, provide that prices charged the City be based on discounts from current manufactur-

---

**11.** Section II. C. discusses the issues raised by defendants concerning contracts numbered 9853, 8182, 9139 and 8972, and the affidavit of Henneman. We will not repeat defendants' arguments or our discussion of those items in this section.

**12.** For both contract and what are alleged to be "non-contract" purchases, Reliable referred to the written contracts on the CP–45s. See discussion in section II.B.

ers' list prices for the parts ordered, that price lists and catalogs be provided to the City, and that invoices be provided to the City detailing the manufacturers' part numbers, list price, and applicable discount (ex. H and copies of contracts attached as exhibits).

The City has provided evidence to demonstrate that Reliable did not follow the pricing terms stated in its contracts with the City. Marszalek reviewed 418 invoices and found that the prices listed on the invoices did not agree with the applicable manufacturers' list price for the product. In addition, Marszalek noted that the description portion of invoices listed a part number that did not correspond to the correct manufacturers' part number. Marszalek identified the particular item on the invoice by referring to the description area of the invoice. He then determined what the contract price should have been by looking at the appropriate manufacturer's price list for the invoice period. The prices charged on the invoice did not match the current manufacture's price list. Instead, the prices (and the part numbers) agreed with the prices and part numbers included on the 1976 "Suggested List Prices for Bendix Heavy Vehicle Systems Group Service Parts" (the 1976 Bendix price list).[13] The 1976 Bendix price list is identical to the purported master price list of all parts from all manufacturers that defendant Koehler had mailed to the City. In most cases the invoices from 1978 to 1987 that were reviewed were not parts manufactured or sold by Bendix and therefore the price charged was not correct.

There is no genuine issue of material fact that Reliable breached its contracts with the City. Marszalek's report and supporting affidavit (along with the other evidence the City has provided) conclusively establish that

on some invoices Reliable did not charge the current manufacturer's list price.[14]

The City has established the fourth element necessary to prevail on its breach of contract claim. It has demonstrated the existence of damages to the City that resulted from defendants' breach. *See* section II.A. Defendants raise their same argument as to damages that we discussed in section II.A above. That argument is without merit.

■ Defendants also argue that principles of waiver, estoppel and abandonment preclude the City from obtaining summary judgment on its contract claim. Those principles do not apply in this case. For instance, in order for defendants to prevail under the doctrine of estoppel they would have to demonstrate that the City made a definite misrepresentation of fact to defendants, having reason to believe that defendants would rely on it, and that defendants did rely on the City's conduct in such a manner as to change their position for the worse. *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984). Reliable's discussions with the various City employees were not an inducement for entering into the original contracts and their reliance on those alleged representations is contradicted by their reference to the contract numbers on the CP–45s. An estoppel theory does not apply.

■ Finally, defendants argue that the 10–year statute of limitations for written contracts does not apply. They argue that the contract cannot be considered written because no quantity terms or delivery terms were included in the contracts and therefore not all of the essential terms of the agree-

---

**13.** For example, the first item on invoice number 43969 is for a part manufactured by Lyon Metal Products that carries part number 8562. The item also included part number 234277. (City Stmt. Undisputed Facts Exh. E). According to Marszalek the applicable current Lyon's list price for this product is $19.15. The corresponding price for part number 234377 from the purported Reliable master price list and the 1976 Bendix price list is $43.62. The invoice charged $43.62 for the item.

**14.** Defendants request that this court strike the affidavit of Marszalek. They claim that Marsza-

lek is not an expert and that his report is invalid because it is statistically unreliable. We need not decide here whether or not Marszalek is an expert. He was qualified to review the invoices and to report his findings. He has been employed by the City's Department of Finance, Internal Audit Division, since 1975, and at the time he performed his analysis he was the Deputy Comptroller in charge of the Internal Audit Division. The questions as to whether Marszalek is an expert or whether his damages calculation is statistically reliable are not relevant here. (See discussions at section II.A.)

ment were reduced to writing. We disagree. The contracts included the essential terms, the City fully performed in accordance with the contracts, and Reliable itself referred to the written contracts when it submitted CP–45s to the City. Reliable cannot refer to the written contracts at one time and then later claim that there are no such written contracts. The 10–year statute of limitations applies.

 We therefore grant in part the plaintiff's motion for summary judgment on its breach of contract claim. There is a question of fact, however, as to the amount of damages. We agree with defendants in that the plaintiff's damage calculation is lacking in statistical reliability.[15]

 There are many ways to estimate damages. One possibility would be to go invoice-by-invoice and determine an almost exact overcharge amount. Although this may be a cumbersome and time-consuming project, it is a viable alternative since essentially all invoices and price lists have been accounted for and provided to the City.

Another method of estimation is similar to that performed by the City. This involves taking a numerical sample of invoices to calculate damages. Thus, a *number* of invoices would be examined and the results from that sample would be extrapolated to the population. The population is then the number of invoices or in this case about 9,900 invoices. Here the City examined 418 of the 9,900 invoices, thus examining 4.2% of total invoices. Since it chose a number of invoices, the question posed is essentially what percentage of the number of invoices include an overcharge. For instance, if the City found that 209 (or 50%) of the 418 invoices were overcharged, then it could conclude that 50% of the 9,900 invoices were in error or overcharged. The next step would be to put this information into dollars. Thus, an average overcharge amount (or per cent) would be determined. This average overcharge error (28% as estimated by the City) could then be extrapolated to the population as follows: 50% of total amount of all invoices times 28% equals damage estimation.

Although this is similar to the City's calculation, several points should be made regarding its estimation. As mentioned by defendants, when selecting a sample of invoices, the population is the total invoices and therefore the percentage error must be applied to the invoice dollar total. In the City's report the overcharge percentage (28%) was multiplied by the total purchases. This would only be proper if the sample had been taken from total payments made by the City to Reliable and therefore had been drawn from the ledgers used by the City to arrive at its total purchase amount (the City's rep. at 3).

Second, if a *number* of invoices are to be reviewed, then each invoice selected should be kept in the sample, and those invoices selected should probably be randomly chosen. Thus, no items from the selected group should be excluded. If, as in the plaintiff's case, it is impossible to determine the necessary product information from some of the invoices, then those items should be so noted and extrapolated as such to the population. This is not to say that the indeterminable items would be considered to be correct, but either a separate estimation of those items could be calculated or the same percentage rate of error for the determinable items could be extrapolated to these items.

Another sampling technique is one that is based on the dollar amount of total invoices, whereby the sample consists of selecting invoice dollar amounts from the population. This, in essence, is what defendants advocate in their memorandum. For example, if the invoices total $1,000,000 and it was determined that a review of 20% of the population would be representative, then a sample— either randomly or judgmentally chosen [16]— of invoices totalling $200,000 (20% of $1,000,000) would be examined. The amount of the dollar overcharge (or error) from this sample

---

15. Again we stress that the plaintiff is not required to provide the "best" technique at this stage of the proceedings and furthermore, damages can be based on any reasonable basis. However, we consider it useful to discuss measures that could easily be applied in order to make the damage estimation more accurate.

16. The sample could be random thereby essentially pulling invoices totalling $200,000 "out of a hat" (e.g. picking every "nth" invoice) or it could be judgmental—where larger invoice items would be selected, more items taken from years where there was more invoice charges, etc.

could then be directly extrapolated to the population. Thus, if the total overcharge from the $200,000 sample was $20,000 (10%), then the estimated population overcharge would be 10% or $100,000 (10% of $1,000,-000). This calculation again is similar to the one performed by the City. However, the City's sample was of a number of invoices and not of a dollar amount of invoices.

Finally, we point out that *before* the sample is drawn it should be established what an adequate sample size would be. Also, the sample should be representative of the population. Thus, if there are particularly large vendors (or contracts) that comprise a significant amount of the invoices, then those vendors/contracts should represent a significant portion of the sample. Similarly, if more invoices pertain to one year, then more from that year should be included in the sample. If the sample is chosen randomly, then the sample should theoretically represent the population, and if the sample is chosen judgmentally, then those factors should be kept in mind.

We have noted just a few of the many possible methods to arrive at a damages estimation. While we decline to comment on what a reasonable estimation of damages would be, we question the reliability of plaintiff's damage calculation. However, we also point out that when the City performed its estimation it did not have complete records and cannot be prejudiced for information that was not made available to it. If plaintiff decides to change its approach and recalculate the damages prior to trial, it must notify defendants.

### D. Accounting

■ The City requests this court to order an accounting "should we decide that the damage figure is not certain enough." The accounts in this case are not so complicated that only a court of equity can satisfactorily unravel them. *Dairy Queen v. Wood,* 369 U.S. 469, 478, 82 S.Ct. 894, 900, 8 L.Ed.2d 44 (1962). A jury, under proper instructions from the court, would be able to determine the amount of damages. *Id.* at 479, 82 S.Ct. at 900. An accounting is therefore not warranted and the defendants have the right to a jury determination on the damages issue.