In re OSTROM–MARTIN, INC., Debtor.

Richard E. BARBER, Chapter 7 Trustee for Ostrom–Martin, Inc., Plaintiff,

v.

GOLDEN SEED COMPANY, INC., Defendant.

Bankruptcy No. 92–80099.
Adv. No. 93–8178.

United States Bankruptcy Court, C.D. Illinois.

Jan. 11, 1996.

---

Gregg N. Grimsley, Peoria, IL, for Defendant.

Barry M. Barash, Galesburg, IL, for Plaintiff.

## OPINION

WILLIAM V. ALTENBERGER, Chief Judge.

This case involves the soybean seed industry and the production of soy bean seed (soybean seed). The industry background is as follows. A developer develops a particular variety of soybean seed (foundation seed). The developer then licenses the rights to reproduce the foundation seed and the right to market the reproduced seed to a dealer. The developer also supplies the foundation seed to the dealer. The dealer then contracts with a producer and supplies the foundation seed to the producer to reproduce the foundation seed into soybean seed. The producer, in turn, contracts with growers to plant the foundation seed and to grow the soybean seed. The producer supervises the planting, growing, and harvesting of the soybean seed. When harvested the growers deliver the soybean seed to the producer, who processes and bags it and delivers it to the dealer. The producer will either keep enough soybean seed to serve as the next year's foundation seed, or return all the soybean seed if the relationship between the dealer and producer is terminated. The dealer then sells the soybean seed either on the wholesale market to retail dealers or on the retail market direct to farmers for soybean production.

In late 1990 or early 1991, Golden Seed Company Incorporated (GOLDEN), as a dealer, and Ostrom–Martin, Inc. (OMI), as a producer, entered into an oral contract whereby GOLDEN was to supply foundation seed to OMI who, in turn, was to reproduce soybean seed for GOLDEN. It was understood that OMI was to contract with various growers to use the foundation seed to grow soybean seed. Under the oral contract between GOLDEN and OMI, OMI was to supervise the growers in their planting, growing and harvesting of the soybean seed crop. When the growers delivered the soybean seed to OMI, OMI was to process and bag it into GOLDEN's bags. GOLDEN agreed to pay OMI the posted per bushel market price at the time of delivery plus a $1.20 per bushel premium. OMI was to pay the growers the posted per bushel market price plus a 40¢ per bag premium.[1] At this point in time GOLDEN had no obligation to the growers.

---

1. Two points need to be noted concerning the method of payments. First, the premium to OMI was based on a per bushel calculation, while the premium to the growers was based on a per bag calculation. Second, the record is confusing as to whether the 40¢ premium to the growers was to be paid from the $1.20 premium, or if the 40¢ premium was in addition to the $1.20 premium. The confusion stems from an earlier deposition of GOLDEN's president, Mr. Werner, where at page 96 he stated that GOLDEN paid OMI the cash price of beans plus $1.20 and in addition to that paid the grower 40 cents a bag. At trial he testified that the statement in the deposition was in error and that the original agreement was that GOLDEN would pay OMI a premium of $1.20.

In early 1991 GOLDEN delivered to OMI 2107 bags of foundation seed. That delivery was evidenced by an invoice from GOLDEN to OMI dated May 31, 1991, for 2107 bags of foundation seed priced at $16,856.00. OMI, in turn, contracted with growers to grow most of the soybean seed. OMI was unable to contract with enough growers to produce all the soybean seed required by GOLDEN. So OMI entered into an oral contract with Baird Seed Co. (BAIRD) to produce soybean seed on 230 acres.

In August of 1991, for its own income tax reasons, GOLDEN contacted OMI to see if it could make a progress payment to OMI. OMI agreed and sent GOLDEN an invoice for 1693 acres @ 42 bushels per acre @ $1.00 per bushel, less a 2% discount, for a total of $69,683.88. GOLDEN prepaid OMI $69,683.88 on the same day.

In September or October of 1991, OMI requested that GOLDEN pay the 40¢ per bag premium, due the growers, direct to the growers and subtract that amount from the contract price due OMI. GOLDEN agreed. Starting in October of 1991, as the growers harvested and delivered the soybean seed to OMI, OMI started to process and deliver the soybean seed to GOLDEN. In December of 1991, GOLDEN paid OMI $75,000.00 and OMI gave GOLDEN a $22,394.00 credit for the 40¢ per bag payment GOLDEN made to the growers.

Due to its inability to maintain certain financial ratios required to keep its State of Illinois grain license, on December 27, 1991, OMI surrendered its license back to the Department of Agriculture of the State of Illinois (DEPARTMENT) and ceased doing business. On the following Monday the DEPARTMENT, pursuant to the State Licensing Law, took control of OMI's business and employed OMI's president, Kenneth Martin, to aid in the wind-down of OMI's business. Soybean seed in OMI's possession continued to be delivered to GOLDEN through January 2, 1992. A total of 62,109 bags of soybean seed were delivered to GOLDEN during the period of October 14, 1991, to January 2, 1992. By the time the DEPARTMENT took control of the business, GOLDEN had taken possession of the majority of soybean seed. What little remained, the DEPARTMENT gave GOLDEN permission to pick up. On January 13 and 21, 1992, GOLDEN wrote two checks to OMI, one for $95,512.16 and one for $69,688.88 respectively. These checks were endorsed to and cashed by the DEPARTMENT. On January 13, 1992, an involuntary petition in bankruptcy was filed against OMI, with an order of relief being entered against OMI on May 1, 1992.

As to the 230 acres subcontracted to BAIRD, BAIRD shipped direct to GOLDEN 11,597 bags of soybean seed at a price of $11.00 per bag, and GOLDEN paid BAIRD the sum of $127,563.00.[2] OMI received nothing on this part of the transaction.

OMI's Trustee in Bankruptcy (TRUSTEE) filed a three count amended complaint against GOLDEN. The first count is under § 548(a)(2) of the Bankruptcy Code, 11 U.S.C. § 548(a)(2), alleging a fraudulent conveyance contending that OMI delivered soybean seed with a fair market value of $654,990.82 while being paid only $240,201.04. Count 2 is brought under § 547 of the Bankruptcy Code, 11 U.S.C. § 547, alleging that the delivery of $101,361.67 in soybean seed within ninety days of the bankruptcy filing was a preference.[3] Count 3 is also under § 548(a)(2) alleging a fraudulent conveyance as to the transfer of a portion of the contract to BAIRD.

■ The TRUSTEE's first two counts are based upon two concepts. First, the Illinois Seed Law, found in 505 ILCS 105/1, *et seq.*, required that the contract between GOLDEN and OMI be in writing. Therefore, the

---

**2.** There is some confusion in the evidence as to the number of bags involved with the subcontract. Plaintiff's Exhibit #20, which is the Trustee's computation, shows, and Mr. Werner admitted, that BAIRD processed 24,162 bags of beans. Mr. Werner also testified that BAIRD had processed some seed which was not related to the OMI contracts. It is not crucial to a decision that those amounts be exactly ascertained.

**3.** The TRUSTEE acknowledges that if he is completely successful under Count 1, there should be no recovery under Count 2.

oral contract between them was of no legal effect. Second, because the oral contract had no legal effect, OMI had no legal obligation to resell the soybean seed crop to GOLDEN and was free to sell it on the open market. Therefore when OMI transferred the soybean seed to GOLDEN at less than open market price, a fraudulent conveyance occurred,[4] or when OMI transferred soybean seed to GOLDEN to satisfy the amount due GOLDEN by OMI, a preference occurred.

Section 548(a)(2) provides that a trustee in bankruptcy may set aside as a fraudulent conveyance a transfer of a debtor's property if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation".[5] Amplifying on the TRUSTEE's position as set out above, the TRUSTEE argues that as GOLDEN had no enforceable contract with OMI, when the growers delivered the soybean seed crop to OMI, OMI was free to sell it to anyone in the same manner, for the same price, as GOLDEN could have sold it on the wholesale or retail market for a higher price than what GOLDEN paid OMI for it. Therefore, there was a transfer of OMI's property for less than "reasonably equivalent value". GOLDEN contends that OMI could not have sold the soybean seed at the dealer level with a specific variety designation, but only as a "brown bag" seed. Therefore, the amount it paid, a lower amount, was "reasonably equivalent value".

This case cannot be determined based on what might have occurred, but on what occurred. In *In re Townsend–Robertson Lumber Co.*, 144 B.R. 407 (Bkrtcy.E.D.Ark.1992), the court examined the meaning of "reasonably equivalent value" stating:

The Eighth Circuit Court of appeals addressed the meaning of "reasonably equivalent value" in *In re Ozark Restaurant Equipment Co., Inc.*, 850 F.2d 342 (8th Cir.1988):

The concept of reasonably equivalent value is a means of determining if the debtor received a fair exchange in the market place for the goods transferred. Considering all the factors bearing on the sale, did the debtor receive fair market value for the property.

*Id.* at 344–45.

Important to the court in reaching its determination that the debtor received reasonably equivalent value was the fact that the transfer was an arms-length transaction.

The fact that OMI might have been able to sell the soybean seed crop in a manner similar to GOLDEN's, is irrelevant.[6] What is relevant is that GOLDEN and OMI had an oral contract which was performed. The relevant issue is whether what OMI received was "reasonably equivalent value" for its performance under the contract? The answer is yes.

■ A factor of considerable importance in assessing reasonably equivalence is whether the sale was an arm's length transaction between a willing buyer and a willing seller. *In re Morris Communications NC, Inc.*, 914 F.2d 458 (4th Cir.1990) Other factors to be considered include the good faith of the transferee and the difference between the amount paid by the transferee and the fair market value. The Supreme Court in *BFP v. Resolution Trust Corp.*, —— U.S. ——, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), in a foreclosure context, stated that the "reasonably equivalent value" criterion would ordinarily equate with "fair market value" outside the foreclosure context.

The oral contract was freely entered into. OMI agreed to limit its participation in the growing and distributing of soybean seed to a middleman position by acting as a producer, an intermediary between the dealer and the growers. It elected not to act as a dealer. By electing to restrict its business activity to the producer level, it elected to being paid as a producer. There was no

4. The TRUSTEE draws a distinction between the posted price of soybean seed in the hands of the grower, which is the basis of the oral contract, and the open market price of soybean seed in the hands of a dealer, the latter being higher.

5. The requirements of § 548(a)(2)(B) are not at issue.

6. This Court does not infer that such a right existed. It is merely accepted for the purposes of stating and analyzing the TRUSTEE's position.

evidence that the posted market price plus the $1.20 premium was not what producers reasonably expected to receive for services of that nature. In fact the evidence was to the contrary. BAIRD testified that the premium of $1.20 charged by OMI was within the market at the time. Lyle Davis, the TRUSTEE's own expert, stated that the $1.20 charged by OMI, while at the low end of the market, was within it. There was not a shred of evidence that the contract between GOLDEN and OMI was a bad deal. The TRUSTEE's theory here is grounded upon an entirely different theoretical deal.

The TRUSTEE's argument that the transaction involved a sale of soybean seed from the growers to OMI and a resale of soybean seed by OMI to GOLDEN, does not help the TRUSTEE succeed under § 548(a)(2). The legal classification of the transfer is not the issue. The issue is one of "reasonably equivalent value". Did OMI get value when it transferred the soybean seed to GOLDEN regardless of the basis of the transfer.[7]

■ Nor is the TRUSTEE's position helped by the TRUSTEE's reliance on § 110/11.1 of the Illinois Seed Law (SEED LAW), 505 ILCS 110/11.1, which provides as follows:

> Any seed permit holder who acquires agricultural seed for resale and conditioning from Illinois producers thereof shall document all such seed acquisition transactions through the use of a seed contract.

Such contracts shall be specifically identified and a complete record of such contracts shall be retained by the seed permit holder. All such contracts shall clearly indicate that the contract consignment is for agricultural seed purposes only, with a clarifying description of the kind of agricultural seed dealt with in each contract.

Even if the statute applies and a written contract was required, the TRUSTEE still doesn't prevail.[8] The statute itself does not provide that a contract which does not comply is unenforceable and void. Rather, the act provides that if a seed dealer violates any of the provisions of the act, the permit may be removed and penalties may be imposed. 505 ILCS 110/12. Penalties may also be imposed against a "person" who violates any of the provisions of the act. 505 ILCS 110/13.

Where a statute governing a particular topic declares a violation to result in a contract being unenforceable and void, the courts so hold. In *Somerset Importers, Ltd., v. Continental Vintners,* 790 F.2d 775 (9th Cir.1986), the court enforced a California regulatory provision which specifically required grape purchase contracts to provide for a final price to be set on a certain date and stated that any "contract entered into in violation of this provision is illegal and unenforceable."

However, where the statute does not provide that the contract is unenforceable and

---

**7.** If this Court did base its opinion on the issue of whether a sale was involved, it would have to hold against the TRUSTEE, as his own witness testified it was not a sale, that the invoice was merely a method of inventory control, and that OMI would have kept some seed for the next year or returned all seed once the relationship ended.

**8.** The SEED LAW is only applicable as to contracts between a permit holder and producers. Producers is not a defined term. Is it used in the same context as that term is used by the parties in this case, or does it mean the growers/farmers? Is it applicable to the GOLDEN–OMI contract, or the OMI grower/farmer contracts? GOLDEN argues it is applicable to the grower/farmer contracts. Another issue, not raised by GOLDEN, is whether the SEED LAW is applicable only where the acquisition is for resale and conditioning. GOLDEN certainly acquired the

soybean seed for resale. But there is nothing in the record to indicate it also conditioned the soybean seed. Section 110/2.108 defines "conditioning" to mean:

> "Conditioning" means drying, cleaning, scarifying or blending to obtain uniform quality, and other operations which would change the purity or germination of the seed and therefore require retesting to determine the quality of the seed, but does not include operations such as packaging, labeling, blending together of uniform lots of the same kind of variety without cleaning, or the preparation of a mixture without cleaning, and of which would not require retesting to determine the quality of the seed.

Nothing in the record indicates that GOLDEN was engaged in any activities that could be classified as "conditioning". It appears to be solely a marketing entity. OMI was the entity conditioning the soybean seed.

void, courts do not automatically so hold. In *Asdourian v. Araj*, 38 Cal.3d 276, 696 P.2d 95, 211 Cal.Rptr. 703 (S.Ct.Cal.1985), the court considered whether an oral contract for home improvements, required by statute to be in writing, was unenforceable. The court stated:

> Generally a contract made in violation of a regulatory statute is void. Normally, courts will not " 'lend their aid to the enforcement of an illegal agreement or one against public policy....' " This rule is based on the rationale that "the public importance of discouraging such prohibited transactions outweighs equitable considerations of possible injustice between the parties."
>
> However, "the rule is not an inflexible one to be applied in its fullest rigor under any and all circumstances. A wide range of exceptions has been recognized." For example, the rule will not be applied where the penalties imposed by the Legislature exclude by implication the additional penalty of holding the contract void. Further, illegal contracts will be enforced to avoid unjust enrichment to the defendant at the expense of the plaintiff.
>
> Plaintiff asserts that a contract entered into in violation of section 7159 is not for that reason void because the exclusive penalties for noncompliance are those provided in the statute.
>
> Violation of [the provision] is a misdemeanor punishable by fine and/or imprisonment. Nothing in the statute declares that an oral contract entered into in contravention of [this provision] shall be void. Whether the statute is to be interpreted as providing exclusive penalties depends upon the intent of the Legislature. (Citations omitted.)

Even though the California legislature had previously deleted a provision which provided that contracts which failed to comply with the provision were not to be deemed to be invalid solely by reason of noncompliance, the court held that the contract was enforceable. The court determined that the misdemeanor

penalties in the statute were sufficient to accomplish the policy behind the statute and that the defendants would be unjustly enriched if they were not required to compensate the plaintiff.

■ In Illinois, the legislature has enacted statutes which take such approach. Under § 34–49 of The Illinois School Code, (105 ILCS 5.34–49), the legislature included such a provision as to the validity/invalidity of a contract in violation of the statute:

> § 34–49. Contracts, expense and liabilities without appropriation. No contract shall be made or expense or liability incurred by the board, or any member or committee thereof, or by any person for or in its behalf, notwithstanding the expenditure may have been ordered by the board, unless an appropriation therefor has been previously made. Neither the board, nor any member or committee, officer, head of any department or bureau, or employee thereof shall during a fiscal year expend or contract to be expended any money, or incur any liability, or enter into any contract which by its terms involves the expenditure of money for any of the purposes for which provision is made in the budget, in excess of the amounts appropriated in the budget. Any contract, verbal or written, made in violation of this section is void as to the board, and no moneys belonging thereto shall be paid thereon....

As previously noted, the statute involved in this case only provides for a loss of license and penalties. If the Illinois legislature would have wanted to include a provision avoiding a contract made in violation of the statute, it surely knew how to do it. Furthermore, the TRUSTEE's request here goes beyond a determination that the contract was unenforceable, for here it was fully performed. Even a contract which is unenforceable if it fails to comply with statutory writing requirement, is enforceable if one side has fully performed. *See City of Chicago v. Reliable Truck Parts Co., Inc.*, 822 F.Supp. 1288 (N.D.Ill.1993).[9]

---

9. This case involved § 2–201(1) of the Uniform Commercial Code as adopted in Illinois, Ill.Ann. Stat. Ch. 26, § 2–201(1), requiring contracts for the sale of goods to state a quantity term to be enforceable.

While the TRUSTEE is not a true stranger here, having stepped into the shoes of OMI, and the overshoes of OMI's creditors, at the point in time he did so this was a done deal. All that remained was for GOLDEN to pay OMI for the seed it had purchased, and to pick up a small amount of soybean seed remaining at OMI, which it did with the approval of the DEPARTMENT. Though the avoiding powers of a bankruptcy trustee are extraordinary, they are not unlimited, and the ability to reach back does not extend to completed contracts, on the basis of mere hypotheticals.

█ Nor does the TRUSTEE fare any better with his fraudulent conveyance attack on the transaction whereby BAIRD took over OMI's responsibilities for 230 acres of soybean seed production.[10] OMI could not contract with growers for those acres. So it subcontracted out its duties and its expected benefits. It provided nothing under the oral contract with GOLDEN as to those acres. So it is entitled to receive nothing. It was a wash transaction from OMI's perspective. If it is entitled to nothing, equivalent value is nothing.

Count 2 of the TRUSTEE's amended complaint alleges GOLDEN received a preference of $101,361.67. It is the TRUSTEE's position that the invoice for the foundation seed in the amount of $16,856.00 and the progress payment of $69,683.88 created an antecedent debt of $87,962.00 which was paid within 90 days of bankruptcy through the transfer of soybean seed by OMI to GOLDEN. GOLDEN contends that the transfers were in the ordinary course of business exception and that it can rely on the theory of recoupment.

Section 547 of the Bankruptcy Code sets forth the requirements for a preference recovery. One of those requirements is that the transfer must be for or on account of an antecedent debt owed by the debtor before such transfer was made. The TRUSTEE's own evidence shows that the amount of the alleged antecedent debt prior to the transfers by OMI was only $87,962.00. Apparently the TRUSTEE has merely calculated the amount of soybean seed transferred to GOLDEN within 90 days of bankruptcy and concluded that amount was preferential. Transfers totalling $87,962.00 could be a preference. But the difference between that figure and $101,361.67, or $13,399.67 could not be. It might be avoidable under some other provision of the Bankruptcy Code, but not § 547.

█ Nor can the $16,856.00 invoice form the basis of a preference recovery as it did not evidence a debt owed by OMI to GOLDEN. It merely was issued to keep track of the amount of foundation seed supplied by GOLDEN to OMI which OMI was either to use the following year or return to GOLDEN. It was a bailment of the foundation seed which did not create a debt for the purposes of § 547.

█ But even if the balance of the transfers totalling $71,106.00 were preferential they are not recoverable by the TRUSTEE if they come within the scope of the ordinary course of business exception of § 547(c) which excepts a transfer that was

   (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

   (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

   (C) made according to ordinary business terms;

The first requirement is that the debt be incurred in the ordinary course of business or financial affairs of both the debtor and the transferee. That is the situation in this case. GOLDEN was in the business of acquiring for sale and selling soybean seed and OMI was in the business of producing soybean seed. They contracted for soybean seed and GOLDEN invoiced OMI for foundation seed and prepaid OMI for services rendered in providing that seed. The debt was incurred

---

**10.** The evidence is conflicting as to the exact number of acres and bags produced. At one point it would appear to be 100–200 acres pro-ducing 7563 bags. At another it is 230 acres producing 11,597 bags. The exact figures do not affect the result.

in the ordinary course of both their businesses.

The second requirement is that the transfer be made in the ordinary course of their businesses or financial affairs. OMI provided either soybean seed or a cash discount pursuant to the oral contract. It was a transfer in the ordinary course of both their businesses.

The third requirement is that the transfer be according to ordinary business terms. The evidence is undisputed that the use of an oral contract and the terms of the oral contract were within ordinary business standards. The TRUSTEE's position is that it was not because of the following:

1. It was illegal under 505 ILCS 110/11.1. That argument has been considered and rejected.

2. The transaction was unique. This Court sees nothing unique in the transaction.

3. The magnitude of the transaction suggests a need for a written contract. It is the terms that are significant, not the form they are evidenced by. Regardless of whether they are agreed to orally or in a writing, their terms were in accordance with ordinary business standards. Furthermore, as previously noted, the evidence was that there was nothing unusual about the oral contract or its terms.

4. The prepayment of $69,683.88 to relieve GOLDEN's tax problem is barely believable. Prepayments for tax purposes are a common occurrence. This Court has no difficulty believing that occurred in this case.

5. GOLDEN's assertion there was no antecedent debt logically means there was no enforceable contract. In the context of § 547(c) this argument is difficult to follow. It would appear the TRUSTEE is taking the position that the transfers were not according to ordinary business terms because there was no enforceable contract. That position overlooks the fact that the transfers were made pursuant to an oral contract, the terms of which were common to the industry, and performed.[11]

6. The diversion of $127,000 worth of production from OMI to BAIRD without OMI receiving any consideration. As previously noted, OMI subcontracted to BAIRD as OMI did not have the capacity to complete the contract. There is nothing unusual in a company subcontracting to meet its contractual obligations, if it does not have the capability to do so. What this Court is concerned with in the preference count is whether as to the balance of the oral contract the transfers to GOLDEN by OMI were according to ordinary business terms. Again, as previously noted, they were.

7. The change in the contract from $1.20 per bag to $1.20 per bag with GOLDEN paying the grower the 40¢ per bag. There is nothing out of the ordinary in changing a contract term. It is done all the time. Nor was there anything in the evidence to indicate that GOLDEN's assumption of an OMI liability was outside ordinary industry standards or practices.

There were several other issues raised during the course of the trial or post-trial briefing that need to be decided.

■ The TRUSTEE also objected to the expert testimony of Doug Baird, called by OMI, on the grounds that as an officer of

---

11. This point seems to be directed to the fraudulent conveyance challenge under § 548 of the Bankruptcy Code. In the TRUSTEE's concluding remarks in his Reply Brief, he states:

When Golden testified that the $69,000 payment was for services rendered up to that point and that the parties were even-steven, it overlooked the point that anything OMI provided after August 30 had to be paid for. And the payment had to be equivalent to the value of the services or product provided after that date. Any uncompensated transfer of OMI's assets after the accounts were zeroed out in late August 1991 is, by definition, a fraudulent conveyance.

The $69,000 payment was not a final payment in exchange for a final delivery of soybean seed. It was a progress payment intended to compensate OMI for the value of its services to date, with GOLDEN and OMI expecting to make more payments and deliveries until they both performed under the oral contract.

BAIRD SEED CO. he was interested in the outcome and therefore not disinterested. The TRUSTEE's objection should be overruled as BAIRD's interest goes to the weight to be given his testimony. As the court in *Liberty Mutual Insurance Company v. B. Frank Joy Co., Inc.*, 424 F.2d 831 (D.C.Cir. 1970), noted:

> [D]isinterestedness is not required of expert witnesses any more than it is required of ordinary witnesses. The interest of a witness is merely one matter that goes to the weight of his testimony.

During the trial there was substantial testimony as to whether the variety of the soybean seed could be identified through DNA testing so as to be sold on the market at a higher price as the variety delivered to GOLDEN by the developer, or if it had to be sold without that designation or plain "brown bag" seed. After the trial, through its post-trial brief, GOLDEN contends that under § 550 of the Bankruptcy Code, 11 U.S.C. § 550, any recovery must be for the "benefit of the estate" and the recovery by the TRUSTEE would not be for the benefit of the estate as it would go to the State of Illinois to satisfy its lien claim. This Court does not reach either of those issues.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

## ORDER

For the reasons set forth in the Opinion entered this day, IT IS HEREBY ORDERED that judgment is entered in favor of the Defendant, GOLDEN SEED COMPANY, INC., and against the Plaintiff, RICHARD E. BARBER, Chapter 7 Trustee for Ostrom–Martin, Inc., on all counts of the First Amended Complaint.