Richard E. BARBER, Chapter 7 Trustee
for Ostrom–Martin, Inc., Plaintiff–
Appellant,

v.

GOLDEN SEED COMPANY, INC.,
Defendant–Appellee.

No. 97–1497.

United States Court of Appeals,
Seventh Circuit.

Oct. 31, 1997.

Argued Sept. 10, 1997.

Decided Oct. 31, 1997.

Barry M. Barash (argued), Barash & Stoerzbach, Galesburg, IL, for Plaintiff–Appellant.

Dee A. Runnels, Snyder & Schwarz, Rock Island, IL, Gregg N. Grimsley (argued), Carter, Grimsley & Rasmussen, Peoria, IL, for Defendant–Appellee.

Gary T. Rafool, Rafool & Bourne, Peoria, IL, for Debtor.

Before BAUER, COFFEY and EASTERBROOK, Circuit Judges.

BAUER, Circuit Judge.

Richard E. Barber ("Trustee"), Chapter 7 Trustee for Ostrom–Martin, Inc. ("OMI"), filed a complaint in bankruptcy court against Golden Seed Company, Inc. ("Golden Seed") on May 24, 1993 to avoid and recover preferential transfers under § 547 of the Bankruptcy Code, 11 U.S.C. § 547. With permission from the bankruptcy court, the Trustee filed an amended complaint on November 17, 1993, which added two counts to avoid and recover fraudulent conveyances under § 548 of the Bankruptcy Code, 11 U.S.C. § 548. The bankruptcy court held a trial on February 9 and 10, 1995 and concluded that there were neither fraudulent conveyances under § 548 nor were there any preferential transfers under § 547. The Trustee appealed to the district court, and on February 6, 1997, the district court affirmed the bankruptcy court's decision. The Trustee now appeals the district court's decision. We affirm.

## Background

### A. Introduction

This case involves the soybean seed industry and the process by which soybean seed is produced. Before discussing the specific facts of this case, an introduction to the soybean seed industry follows to facilitate an understanding of the facts. *See In re Ostrom–Martin, Inc.*, 191 B.R. 126 (Bankr. C.D.Ill.1996).

A developer of soybean seed develops a particular variety of soybean seed, otherwise termed "foundation seed," which is the parent seed used to produce the soybean seed, and licenses the right to reproduce and to market that foundation seed to a dealer. Generally, the developer provides the foundation seed for the dealer. The dealer then contracts with a producer to reproduce the foundation seed into soybean seed. The producer, in turn, contracts with growers to plant the foundation seed and to grow soybean seed. Usually, the producer supervises the planting, growing, and harvesting of the soybean seed.

Once the soybean seed is harvested, the growers deliver the seed to the producer, who processes and bags it and delivers the seed to the dealer. The producer will either keep enough soybean seed to serve as next year's foundation seed or return all the soybean seed to the dealer. The dealer then sells the soybean seed either on the wholesale market to retail dealers or on the retail market direct to farmers for soybean production.

### B. Facts

With that introduction, we now turn to the facts of this case. In early 1991, OMI, as a producer, and Golden Seed, as a dealer, entered into an oral contract whereby Golden Seed agreed to supply foundation seed to OMI, and OMI agreed to reproduce the soybean seed for Golden Seed. As customary within industry practice, it was understood that OMI was to contract with various growers to use the foundation seed to grow soybean seed. Under the oral contract, OMI's services included supervising the growers in their planting, growing, and harvesting of the soybean seed crops. After the growers delivered the seed to OMI, OMI's services also included the obligation to clean, process, and bag the soybean seed into Golden Seed bags and ultimately to deliver the bean seed to Golden Seed. Golden Seed agreed to pay OMI the posted per bushel market price at the time of the delivery, plus a $1.20 per bushel premium. OMI was to pay the growers the posted per bushel market price, plus a $.40 per bag premium. At the time the contract was created, Golden Seed had no obligation to the growers.

Before the 1991 planting season and pursuant to the OMI–Golden Seed contract, Golden Seed delivered 2,107 bags of foundation seed to OMI as evidenced by an invoice for $16,856.00 dated May 31, 1991. OMI subsequently contracted with various growers to grow the soybean seed. However, OMI was unable to contract with enough growers to produce all the soybean seed required by Golden Seed. OMI then entered into an oral contract with Baird Seed Company ("Baird") to produce soybean seed on 230 acres.

In August of 1991, Golden Seed contacted OMI and inquired about making an early payment to OMI for its own tax reasons. OMI agreed to this payment and sent Golden Seed an invoice for $69,683.88. Golden Seed, in response, paid OMI the invoiced amount that same day.

In September or October of 1991, OMI requested that Golden Seed pay the $.40 premium per bag to the growers directly and then subtract that amount from the contract price due to OMI. Golden Seed agreed. Starting in October 1991, as the growers began to harvest and deliver the seed to OMI, OMI started to process, bag, and deliver the soybean seed to Golden Seed. In December 1991, Golden Seed paid OMI $75,000.00 with OMI giving Golden Seed a $22,394.00 credit for the $.40 per bag payment Golden Seed made to the growers.

Due to its inability to maintain certain financial ratios required by the State of Illinois to maintain its grain license, on December 27, 1991, OMI surrendered its license to the Department of Agriculture and ceased doing business. Pursuant to state licensing

laws, the Department of Agriculture took control of OMI's business and employed Kenneth Martin, OMI's president, to help in the winding-down of OMI's business. Soybean seed continued to be delivered to Golden Seed through January 2, 1992. A total of 62,129 bags of soybean seed was delivered to Golden Seed during the period of October 14, 1991 to January 2, 1992.

By the time OMI had lost its license and the Department of Agriculture took control of the business, OMI had delivered and Golden Seed had taken possession of the majority of the soybean seed. The Department of Agriculture permitted Golden Seed to pick up the remaining bags of seed. On January 13 and 21, 1992, Golden Seed wrote two checks to OMI, one for $95,512.16 and the other for $69,688.88. These checks were endorsed to and cashed by the Department of Agriculture. Also on January 13, 1992, OMI filed bankruptcy.

Meanwhile, as to the 230 acres OMI subcontracted to Baird, Baird shipped direct to Golden Seed 11,597 bags of soybean seed at a price of $11.00 per bag, and Golden Seed paid Baird $127,563.00 for the seed. OMI received nothing from this transaction.

## C. The Bankruptcy Court Proceedings

Richard E. Barber, OMI's Trustee in bankruptcy, filed a three count amended complaint against Golden Seed in bankruptcy court. Count I alleged a fraudulent conveyance under § 548(a)(2) of the Bankruptcy Code, 11 U.S.C. § 548(a)(2), contending that OMI delivered soybean seed with a fair market value of $654,990.82 while being paid only $240,201.04. Count II was brought under § 547 of the Bankruptcy Code, 11 U.S.C. § 547, alleging that the delivery of $101,-361.67 in soybean seed within ninety days of the bankruptcy filing was a preference. The third count also was filed under § 548(a)(2), 11 U.S.C. § 548(a)(2), alleging a fraudulent conveyance as to the transfer of a portion of the contract to Baird Seed Company.

After a two day trial on February 9 and 10, 1995, the bankruptcy court concluded that there were not any fraudulent transfers under § 548 nor were there any preferential transfers under § 547. The bankruptcy court found that: (1) OMI received "reasonably equivalent value" for its performance under the oral contract; (2) the oral contract between OMI and Golden Seed was valid and enforceable; (3) the Golden Seed–Baird transaction was not a fraudulent conveyance; and (4) the transfers were within the ordinary course of business for preference purposes. In reaching these conclusions, the bankruptcy court focused on the validity of an oral contract pursuant to the Illinois Seed Law and whether there was an exchange of reasonably equivalent value.

## D. The District Court Proceedings

The Trustee then appealed to the district court, alleging that the bankruptcy court erred in its conclusions that there was not a fraudulent conveyance nor was there a preferential transfer between OMI and Golden Seed. The standard of review used by a district court in assessing a bankruptcy court's findings of fact is the clearly erroneous standard. In re West, 22 F.3d 775, 777 (7th Cir.1994). The district court, upon consideration of the record,[1] agreed with the bankruptcy court that OMI had received reasonably equivalent value for the transfer of soybean seed. In reaching this result, the district court reviewed the bankruptcy court proceedings and its findings of fact. The district court also recognized that when OMI subcontracted out to Baird its duties to Golden Seed, it also contracted out the expected benefits. As such, the district court also agreed with the bankruptcy court's finding that Golden Seed did not receive an avoidable preference pursuant to § 547. Accordingly, the district court affirmed the bankruptcy court's decision.

The Trustee now appeals the district court's order to affirm the bankruptcy court's decision. He again argues that: (1) the transfers of the soybean seed shortly before OMI's bankruptcy are avoidable fraudulent

---

1. Although the Trustee requested oral argument in the district court, the court decided the appeal on the record.

conveyances under § 548 of the Bankruptcy Code; and (2) the transactions between Golden Seed and OMI were preferential transfers under § 547 of the Bankruptcy Code.

## Analysis

 We review the district court's decision to affirm the bankruptcy court under the clearly erroneous standard. *In re Marrs–Winn Co., Inc.*, 103 F.3d 584, 589 (7th Cir. 1996). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, a court of appeals may not reverse it. . . ." *In re Pearson Bros. Co.*, 787 F.2d 1157, 1160 (7th Cir.1986).

### A. The Transfer of the Soybean Seed as an Avoidable Transfer

 First, the Trustee argues that the transfer of the soybean seed to Golden Seed is an avoidable transfer under § 548 and that the issue on appeal is whether OMI received reasonably equivalent value in exchange for the transfer of the soybean seed. Section 548 states:

> The trustee may avoid any transfer . . . that was made or incurred on or within one year before the date of the filing of the petition, if the debtor . . . received less than a reasonably equivalent value in exchange for such transfer or obligation.

§ 548(a)(2). To prevail in a fraudulent conveyance action under § 548, the Trustee must prove that the debtor received less than reasonably equivalent value. *In re Bundles*, 856 F.2d 815, 816–17 (7th Cir.1988). The test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the court to determine the value of what was transferred and to compare it to what was received. *Matter of Vitreous Steel Products Co.*, 911 F.2d 1223, 1234–35 (7th Cir.1990).

 The burden of proving lack of reasonably equivalent value under § 548 rests on the Trustee. *In re Rodriguez (General Electric Credit Corp. of Tennessee v. Murphy)*, 895 F.2d 725, 726 (11th Cir.1990). We

have held that the formula for determining reasonably equivalent value is not a fixed mathematical formula; rather, the standard for "[r]easonable equivalence should depend on all the facts of each case," an important element of which is fair market value. *In re Bundles*, 856 F.2d at 824. Another important factor in assessing reasonably equivalent value is whether the sale was "an arm's length transaction between a willing buyer and a willing seller." *Id.* at 824. Additionally, other courts have held that the debtor need not collect "a dollar-for-dollar equivalent to receive reasonably equivalent value." *See Matter of Fairchild Aircraft Corp.*, 6 F.3d 1119, 1125–26 (5th Cir.1993) (footnote omitted).

### 1. The Payments Received By OMI

 Specifically, the Trustee claims that OMI transferred 60,022 bags [2] of bean seed worth $850,000.00 and received only $240,-000.00. Initially, it is important to examine the figures the Trustee asserts are valid and which he uses in his calculations. Golden Seed made four payments to OMI: (1) $69,-683.88 in August of 1991; (2) $75,000.00 in December 1991 which included a $22,394.00 credit for the $.40 payments Golden Seed made to the growers; (3) $95,512.16 and $69,688.88 on January 13 and 21, 1992 for the seed delivered between October 1991 and January 1992. These payments total $309,-883.92 which Golden Seed paid OMI.

The Trustee, however, uses the figure "$240,000.00," which accurately is $240,-201.04, because he does not include the first progress payment of $69,683.88 in the total amount received by OMI. The Trustee contends that the initial payment was not a progress payment but rather a final payment, or an "even-steven payment," which should not be included in the calculations for payments ultimately received by OMI. The bankruptcy court, however, rejected this argument and classified the $69,683.88 payment as a progress payment to be included in the total amount paid by Golden Seed. *In re*

---

**2.** In calculating the number of bags of soybean seed OMI delivered to Golden Seed between October 1991 and January 1992, the total amount of bags was 62,129. However, Golden Seed

originally supplied OMI with 2,107 bags of foundation seed. Thus, the total number is 60,022 bags because the original 2,107 bags of foundation seed are not included.

*Ostrom–Martin, Inc.*, 191 B.R. at 134 n. 11. The bankruptcy court concluded that the "even-steven" payment "was a progress payment intended to compensate OMI for the value of its services to date, with GOLDEN and OMI expecting to make more payments and deliveries until they both performed under the oral contract." *Id.* at 126, 134 n. 11. The district court agreed with the classification of the $69,683.88 payment as a progress payment. *In re Ostrom–Martin, Inc.*, No. 96–1118, Slip Op. at p. 3 (C.D.Ill. Feb. 6, 1997).

### 2. The Value of the Seeds

■ The Trustee then argues that the value of the seed was worth in excess of the $4.00 per bag which OMI received. However, this "$4.00 per bag" figure was calculated by using $240,201.04 and not $309,884.92. The bankruptcy court concluded that "the posted market price plus the $1.20 premium" was a reasonable payment to expect for the transaction. *In re Ostrom–Martin*, 191 B.R. at 131. The district court recognized that the bankruptcy court did not place a numerical value on the beans Golden Seed received, but stated that it was "comfortable equating the Bankruptcy Court's approval of this formula for the contract price with approval of the payments received." *In re Ostrom–Martin, Inc.*, No. 96–1118, Slip Op. at 9–10. Accordingly, the district court interpreted the bankruptcy court's decision as "approving of $309,884.92 as payment for 60,022 bags of beans, or $5.16 per bag." *Id.* at 9–10 (footnote omitted).

■ In further support of his argument, the Trustee asserts that the grain value of the soybean seed alone is $4.87 per bag and that the cleaning and bagging of the seed increased the value by $.80 for a total "minimum" value of $5.67. The Trustee continues to argue that the seed had a retail value of $13.75 per bag and further explains that his expert testified that the seed was worth between $9.00 and $11.00 on the wholesale market.

However, the Trustee's discussion of what the soybean seed would have been worth on the retail or wholesale market is useless because the only value which matters in this case is the basic market value of the soybeans as determined by the contract between Golden Seed and OMI. Neither the wholesale nor the retail market was available to OMI. The bankruptcy court stated that "[t]his case cannot be determined based on what might have occurred, but on what occurred." *In re Ostrom–Martin*, 191 B.R. at 130. The district court similarly rejected the Trustee's attempt to argue that the soybean seeds would have had a greater value on either the retail or wholesale market.

### 3. The Validity of the Oral Contract Between OMI and Golden Seed

■ Next, the Trustee challenges the validity of the oral contract between OMI and Golden Seed, contending that the bankruptcy court and the district court erred in their conclusion that the oral contract between OMI and Golden Seed is valid and enforceable. The Trustee argues that the oral seed contract is illegal and unenforceable because it violates the Illinois Seed Law. *See* 505 ILCS 110/11.1. The Illinois Seed Law states in pertinent part:

> Any seed permit holder who acquires agricultural seed for resale and conditioning from Illinois producers thereof shall document acquisitions through their use of a seed contract.

505 ILCS 110/11.1. Under this provision, the Trustee contends that an *oral* contract for soybean seed is not valid. The bankruptcy court, however, rejected this argument. The bankruptcy court found that because Golden Seed was acquiring seed for resale and not "resale and conditioning," the statute did not apply. *In re Ostrom–Martin*, 191 B.R. at 130 n. 8. The bankruptcy court alternatively held that even if the statute did apply and required a written contract, the statute does not provide that a contract which does not comply with the statutory requirements is unenforceable and void. *Id.* at 131. It concluded that "[t]here was not a shred of evidence that the contract between Golden Seed and OMI was a bad deal." *Id.*

The bankruptcy court also recognized that even a contract which is unenforceable because it fails to comply with a statutory

writing requirement is enforceable if one side has fully performed. *Id. See also City of Chicago v. Reliable Truck Parts Co., Inc.,* 822 F.Supp. 1288 (N.D.Ill.1993). Accordingly, the bankruptcy court concluded the contract between OMI and Golden Seed is valid, and the subsequent delivery of the seed pursuant to contract provisions was proper and price determined by market value plus the premium was consistent with the terms of the contract. The district court agreed with the bankruptcy court and rejected the Trustee's contention that the bankruptcy court "made an error of law." *In re Ostrom–Martin, Inc.,* No. 96–1118, Slip Op. at p. 12. The district court also agreed that Illinois Seed Law did not apply and that the oral contract between OMI and Golden Seed is valid and enforceable. *Id.*

### 4. The Golden Seed–Baird Transaction

■ Finally, the Trustee argues that Golden Seed's payment of $127,563.00 to Baird also qualifies as an avoidable transfer under § 548. As discussed above, OMI was unable to fulfill its obligation under the contract with Golden Seed to satisfy Golden Seed's capacity requirements for seed production. Consequently, OMI subcontracted with Baird to produce soybean seed on 230 acres. The bankruptcy court recognized that there is nothing unusual for a company to subcontract with a third party to satisfy its contractual obligations. *In re Ostrom–Martin,* 191 B.R. at 133–34. The bankruptcy court recognized that once OMI contracted out its duties under the contract to Baird, it also relinquished any benefit it would have enjoyed under the contract. *Id.*

Baird shipped directly to Golden Seed 11,-597 bags of soybean seed at a price of $11.00 per bag, and Golden Seed paid Baird the sum of $127,563.00. OMI received nothing from this transaction between Baird and Golden Seed. The bankruptcy court concluded that the subcontract between OMI and Baird was within industry standards, and Golden Seed's payment to Baird for the delivery of the bean seed was consistent with ordinary business practice. *Id.* The bankruptcy court concluded that OMI:

[P]rovided nothing under the oral contract with Golden as to those acres [contracted out to Baird]. So [OMI] is entitled to receive nothing. It was a wash transaction from OMI's perspective. If it is entitled to nothing, equivalent value is nothing.

*Id.* at 133. The district court agreed that when OMI contracted its duties to Baird, it also contracted out any benefits it would be entitled to under the contract. *In re Ostrom–Martin, Inc.,* No. 96–1118, Slip Op. at 11.

■ The findings of the bankruptcy court as discussed above—the $69,683.88 progress payment, the value of the soybean seed, the validity of the oral contract, and the subcontract between Baird and OMI—support its conclusion that there was not a fraudulent transfer under § 548 which the Trustee could avoid. As we have recognized before, a bankruptcy court's findings on the fact-intensive issue of whether the debtor received reasonably equivalent value receives "great deference." *In re Bundles,* 856 F.2d at 825.

We find absolutely no reason to substitute our judgment for that of the district court and the bankruptcy court, and we are certainly in no position to question how much weight the bankruptcy court gave to the testimony. In short, we too conclude that the bankruptcy court did not err in finding that the transfer of the soybean seed from OMI to Golden Seed is not an avoidable transfer under § 548 of the Bankruptcy Code. Accordingly, the district court did not err in its conclusion to affirm the bankruptcy court's decision that OMI received reasonably equivalent value in exchange for the transfer of the soybean seeds.

### B. OMI Payments as an Avoidable Preference

■ Alternatively, it is the Trustee's position that the $16,856.00 invoice for the foundation seed and the "even-steven" payment of $69,683.88 created an antecedent debt of $86,539.88 and consequently form the basis for a preference recovery under § 547 of the Bankruptcy Code because the transfer occurred within 90 days of bankruptcy.

First, the Trustee suggests that the bankruptcy court erred in its determination that the original transfer of the foundation seed from Golden Seed to OMI was a bailment. The Trustee argues that the $16,856.00 invoice is a debt owed by OMI and thus creates a preference. The bankruptcy court rejected this argument and found that the invoice merely recorded the amount of foundation seed delivered to OMI to keep track of the amount supplied. *In re Ostrom–Martin,* 191 B.R. at 133. The district court agreed.

The Trustee claims that the second element of the preference is the "even-steven" payment of $69,683.88. As discussed above, both the bankruptcy court and the district court concluded that this payment was a progress payment. *Id.* at 126, 129, 134. Although the Trustee attempted to appeal that conclusion, he also argues in the alternative that if the $69,683.88 is not a final payment, then it qualifies as a loan to OMI which was repaid by the delivery of seed within 90 days of bankruptcy. The bankruptcy court rejected the characterization of the payment as a loan and recognized that "prepayments for tax purposes are a common occurrence" and fall within the ordinary course of business. *Id.* at 134. The district court agreed and refused to disrupt the bankruptcy court's conclusion.

The Trustee argues that Golden Seed received an avoidable preference of $86,539.88 [3] pursuant to § 547. Section 547 provides:

(c) The trustee may not avoid under this section a transfer-

(2) to the extent that such transfer was-

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to business terms.

§ 547(c). The transferee has the burden to demonstrate that the transfer was not a preference and thus not avoidable by the Trustee. 11 U.S.C. § 547(g). The focus regarding the elements of § 547(c)(2) differ. *See Matter of Midway Airlines, Inc.,* 69 F.3d 792, 797 (7th Cir.1995). As to §§ 547(c)(2)(A) and 547(c)(2)(B), a court's focus is on the specific relationship between the parties and the particular course of dealing between the parties. Courts look to a variety of factors to determine if the payments in question were ordinary as between the parties:

Among factors courts consider in determining whether transfers are ordinary in relation to past practices are: (1) the length of time the parties were engaged in the transaction at issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) whether the creditor took advantage of the debtor's deteriorating financial condition.

*In re Midway Airlines, Inc.,* 180 B.R. 1009, 1013 (Bankr.N.D.Ill.1995) (citing *In re Grand Chevrolet, Inc.,* 25 F.3d 728, 732 (9th Cir.1994) (citations omitted)). But when considering § 547(c)(2)(C), a court must focus on industry standards and common practice. To satisfy § 547(c)(2)(C), the transferee need only establish that its own dealings with the debtor fall "within the outer limits of normal industry practice." *In re Tolona Pizza Products Corp.,* 3 F.3d 1029, 1033 (7th Cir.1993).

Under § 547(c)(2)(A), the debt must be incurred in the ordinary course of business between both parties. Golden Seed was in the business as a dealer of soybean seed and OMI was in the business as a producer of soybean seed. The invoice of the seed and the prepayment for services rendered reflect the fact that the debt was incurred in the ordinary course of both Golden Seed and OMI's businesses. Next, pursuant to § 547(c)(2)(B), the transfer must be made in the ordinary course of business. OMI provided either a cash discount or soybean seed

---

**3.** This figure is calculated by adding together $16,856.00 which is the 2,107 bags of foundation seed invoiced to OMI and $69,683.88 which is the money OMI claims is the "even-steven" payment.

pursuant to the oral contract between OMI and Golden Seed. Thus, the transfer was in the ordinary course of both their businesses. Finally, under § 547(c)(2)(C), the transfer must fall within industry standards. The bankruptcy court concluded that there was undisputed evidence that the oral contract and its terms fell within ordinary business standards. *Id.* at 134. Accordingly, the bankruptcy court concluded that a debt was incurred, the transfer was made, and the terms of the transfer all were according to ordinary business standards. *Id.* at 133–34.

In reviewing the bankruptcy court record, the district court stated:

> This Court finds that the Bankruptcy Court's rejections of the Trustee's positions constitute findings of fact that are not clearly erroneous. The views presented in the Bankruptcy Court's decision present permissible views and fail to firmly convince this Court of a mistake.

*In re Ostrom–Martin, Inc.,* No. 96–1118, Slip Op. at 16–17. As the district court concluded, we too decline to disrupt the findings of the bankruptcy court and agree with the district court that Golden Seed did not receive an avoidable preference pursuant to § 547(c) of the Bankruptcy Code.

### Conclusion

Our examination of the record clearly indicates that there was sufficient evidence to support the bankruptcy court's decision. For the foregoing reasons, we AFFIRM the district court's judgment to affirm the bankruptcy court's decision. We also AFFIRM as to all other issues raised on appeal.