# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 03-2443

_____

| | | |
|---|---|---|
| In re: MJK Clearing, Inc., | * | |
| | * | |
| Debtor. | * | |
| | * | |
| _____ | * | |
| | * | |
| Ferris, Baker Watts, Inc., | * | |
| | * | |
| Appellant, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | District of Minnesota |
| | * | |
| James P. Stephenson, Trustee for MJK | * | |
| Clearing, Inc.; Securities Investor | * | |
| Protection Corporation, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: February 12, 2004
Filed: June 9, 2004

_____

Before MORRIS SHEPPARD ARNOLD, JOHN R. GIBSON, and RILEY, Circuit
Judges.

_____

RILEY, Circuit Judge.

Ferris, Baker Watts, Inc. (Ferris) filed an adversary proceeding in the bankruptcy court[1] against James P. Stephenson, the trustee (Trustee) for MJK Clearing, Inc. (MJK), to recover approximately $18 million in cash Ferris pledged as collateral for a stock-loan transaction. Ferris requested that the bankruptcy court impose a constructive trust or compel the Trustee to tender the cash collateral to Ferris. The Trustee counterclaimed, requesting that the bankruptcy court declare, to the extent Ferris had an interest in MJK's deposit accounts, the Trustee could avoid Ferris's interest using his strong-arm powers. On cross-motions for summary judgment, the bankruptcy court concluded Ferris held a general unsecured claim against MJK's estate, and granted the Trustee summary judgment on the remaining claims. Ferris appealed to the district court,[2] which affirmed. Ferris appeals. We affirm.

## I.  BACKGROUND

Four days before MJK's financial demise, Ferris and MJK entered into a stock-loan transaction for GenesisIntermedia, Inc. (GENI) stock (stock-loan transaction). The Master Securities-Loan agreement (MSL) between Ferris and MJK governed the stock-loan transaction. The MSL required Ferris to pledge cash collateral equal to the current fair market value of the GENI stock to secure the stock-loan. MJK was required to identify the collateral on its books; however, the MSL permitted MJK to use or invest the cash collateral and did not require MJK to segregate the collateral. The MSL also allowed MJK to "pledge, repledge, hypothecate, rehypothecate, lend, relend, sell or otherwise transfer" the collateral.

---

[1]The Honorable Robert J. Kressel, United States Bankruptcy Judge for the District of Minnesota.

[2]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

On September 21, 2001, to consummate the stock-loan transaction, Ferris transferred $22 million, the current fair market value of the GENI stock subject to the transaction, as collateral (cash collateral) to MJK's Depository Trust Company (DTC) account, and MJK transferred two million shares of GENI stock to Ferris's DTC account. MJK also had numerous other unrelated transactions settled through the DTC account on the same day, with the transactions settled on a net basis, rather than on an individual basis. By the end of day, MJK's DTC account balance was negative, requiring MJK to transfer funds from one of its bank accounts to the DTC account.

As the price of the GENI stock fluctuated, Ferris and MJK "marked to market."[3] Four days before MJK's financial demise, GENI stock declined $1 per share. To "mark to market," MJK transferred $2 million to Ferris. One day before MJK's demise, GENI stock again declined another $1 per share. The following morning, MJK transferred $2 million to Ferris to "mark to market," leaving $18 million of Ferris's cash collateral in MJK's possesion. When the price of the GENI stock then fell $3 per share, Ferris demanded MJK transfer $6 million to Ferris. MJK failed to comply, which was a default under the MSL.

The same day, trading of GENI stock was halted, and MJK notified federal regulators it lacked adequate capital to operate. Two days later, at the Securities Investors Protection Corporation's (SIPC) request, the district court entered a protective decree under 15 U.S.C. § 78eee(b) (2000) against MJK, appointing the

---

[3]"Marking to market" is the process of equalizing the value of cash collateral to the stock held by the debtor. If the stock's price declines, the lender returns the difference between the stock's fair market value and the collateral. Conversely, if the stock's price rises, the debtor transfers to the lender collateral equal to the difference between the stock's fair market value and the collateral. The parties "mark to the market" each business day.

Trustee and removing the case to the bankruptcy court.[4] After the district court entered the protective decree, Ferris tendered the GENI stock to the Trustee, demanding the Trustee return Ferris's cash collateral. The Trustee refused.

Ferris brought an adversary proceeding in the bankruptcy court. Asserting MJK fraudulently misrepresented its financial condition and its compliance with federal regulations when entering the stock-loan transaction, Ferris requested the bankruptcy court impose a constructive trust on assets of MJK's estate. Ferris also asserted the MSL obligated the Trustee to return the cash collateral, asking that the bankruptcy court compel the Trustee to return its property. Ferris contended the cash collateral is not property of the estate as defined by 11 U.S.C. § 541. The Trustee counterclaimed, seeking a declaration that Ferris held only a general unsecured claim against MJK's estate, and, to the extent Ferris held an interest in monies held in MJK's accounts, the Trustee could use section 544 of Title 11, the strong-arm clause, to avoid Ferris's interest.

On cross-motions for summary judgment, the bankruptcy court entered partial summary judgment for Ferris and the Trustee. The bankruptcy court granted Ferris a general unsecured claim against MJK's estate for over $19 million.[5] Concluding Ferris could not trace its cash collateral to any property of MJK's estate and Ferris could not prove fraudulent inducement, the bankruptcy court declined to impose a constructive trust. The bankruptcy court also refused specific performance. Alternatively, the bankruptcy court concluded Ferris could not prevail because, even

[4]Under the Securities Investors Protection Act (SIPA), the bankruptcy court has jurisdiction over SIPA liquidation proceedings. 15 U.S.C. § 78eee(b)(4). Except as inconsistent with SIPA, chapters 1, 3, and 5 and parts of chapter 7 of Title 11 govern SIPA liquidation proceedings. Id. § 78fff(b).

[5]Besides the $18 million remaining from the stock-loan transaction, the general unsecured claim includes amounts used to collateralize other transactions that are not subject to this appeal.

if Ferris could trace the cash collateral to an asset of MJK's estate, the cash collateral was customer property under SIPA, and the Trustee could avoid Ferris's interest under section 544(a).

Ferris appealed to the district court, which affirmed in all respects. Ferris appeals to this court, contending (1) it is entitled to a constructive trust because it presented substantial evidence of fraudulent inducement, and it can trace its interest in the cash collateral to property of MJK's estate; (2) MJK's breach of the MSL requires the Trustee to turn over $18 million from MJK's estate to Ferris; (3) the Trustee cannot use his strong-arm power to avoid Ferris's interest; and (4) the $18 million it seeks from MJK's estate is not customer property under SIPA. Because our resolution of the tracing issue dispenses with all issues on appeal, we only discuss whether Ferris can trace the cash collateral to any assets of MJK's estate.

## II.    DISCUSSION

"We review [a court's] grant of summary judgment de novo." Interstate Cleaning Corp. v. Commercial Underwriters Ins. Co., 325 F.3d 1024, 1027 (8th Cir. 2003). "We will affirm [a court's] grant of summary judgment 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . ,' demonstrate that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Id. (quoting Fed. R. Civ. P. 56(c)).

"State law governs the resolution of property rights within a bankruptcy proceeding." Chiu v. Wong, 16 F.3d 306, 309 (8th Cir. 1994). All agree Minnesota law governs this case. To establish the right to a constructive trust under Minnesota law, Ferris must prove MJK obtained the cash collateral by fraud, by bad faith, or by other improper means. Henderson v. Murray, 121 N.W. 214, 216 (Minn. 1909). Beyond proof of wrongful conduct, Ferris must trace the cash collateral "into an identified product" or property currently in MJK's estate. Chiu, 16 F.3d at 310.

-5-

A constructive trust may be imposed only when there is some specific property identified as belonging, in equity and conscience, to the plaintiff. . . . A constructive trust does not arise unless there is property on which the trust can be fastened, and the property is held by the person to be charged as constructive trustee.

Rock v. Hennepin Broad. Assocs., 359 N.W.2d 735, 739 (Minn. Ct. App. 1984) (citations omitted) (requiring "clear and convincing evidence" before imposing constructive trust).

To trace assets in an account, we employ the lowest intermediate balance test. See 5 Lawrence P. King, et. al., Collier on Bankruptcy ¶ 541.11[5] (15th ed. rev. 2004). Ferris and the Trustee accept the applicability of this test. Under the lowest intermediate balance test, a court follows the trust fund to and decrees "restitution from an account where the amount on deposit has at all times since the commingling of the funds equaled or exceeded the amount of the trust fund." Conn. Gen. Life Ins. Co. v. Universal Ins. Co., 838 F.2d 612, 619 (1st Cir. 1988). "Should the amount on deposit be reduced below the amount of the trust fund but not depleted, the claimant is entitled to the lowest intermediate balance in the account." Id. The lowest intermediate balance test is based on a fiction that non-trust funds are first withdrawn, retaining as much of the trust fund as possible in the account. Id. However, if the account is depleted after the trust fund has been deposited, the trust fund is treated as lost. Id.; see also First Fed. of Mich. v. Barrow, 878 F.2d 912, 915 (6th Cir. 1989); In re United States Cigar Stores Co. of Am., 70 F.2d 313, 316 (2d Cir. 1934).

Ferris asks us to apply the lowest intermediate balance test to all of the cash and cash equivalents in MJK's estate, not just to the DTC account. Ferris asserts Beiger v. IRS, 496 U.S. 53 (1990), and Chui mandate such an approach. Beiger does not support Ferris's approach. In Beiger, the Supreme Court considered whether a bankruptcy trustee could avoid prepetition tax payments to the IRS. After concluding the Internal Revenue Code (IRC) created a trust for the IRS's benefit, the Court

considered whether the IRS could trace the prepetition transfers to the IRC-created trust. Noting a common-law trust did not arise until the settlor identified the property subject to the trust, the Court concluded the IRC-created "trust is radically different from the common-law paradigm." Beiger, 496 U.S. at 62. The IRC-created trust is in an abstract "amount" and is not tied to a particular asset. Id. Because of the differences between the IRC-created trust and a common-law trust, the Court decided the tracing rules used for common-law trusts were not helpful. Id. at 62-63. Ultimately, the Court concluded the amounts paid prepetition by a taxpayer are presumed to be from the IRC-created trust. Id. at 65-67.

Beiger's tracing rules do not apply to constructive trusts. Unlike an IRC-created trust, "[t]he point of tracing [for a common-law or a constructive trust] is to follow the *particular* entrusted assets, not simply to identify *some* assets." Conn. Gen. Life, 838 F.2d at 620. The constructive trust Ferris seeks to impose is a creature of equity. A constructive trust's subject is property wrongfully obtained by another. Chui, 16 F.3d at 309; Henderson, 121 N.W. at 216. Thus, like a common-law trust, a constructive trust creates a trust in specific property, not an amorphous "amount." See Chiu, 16 F.3d at 309.

Chui also does not support Ferris's approach. First, Chui sought to impress a constructive trust in the bankruptcy court, not upon the bankruptcy estate, but upon Wong's personal real estate for the wrongful termination of a partnership with Wong's husband, Lai. Id. at 307-08. After wrongfully terminating the partnership, Lai continued to operate one of the businesses, using the cash and inventory from the partnership. Lai and Wong later incorporated the business, which assumed the partnership's cash and inventory. Lai and Wong also opened a bank account for this business. Id. at 307. Lai and Wong later incorporated several successor corporations, with each successor corporation assuming the predecessor's cash and inventory. While Wong and Lai operated the business, Wong occasionally withdrew money from the corporation's bank account for compensation, depositing the funds into her

personal bank account. Wong then used money from her personal bank account to purchase the real estate. Id. at 308. A panel of this court noted Lai's and Chui's partnership interests merged into an indistinguishable mass when Lai improperly terminated the partnership, attaching to the property used by the successor businesses. Id. at 310. Reasoning Wong purchased the real estate with funds from her bank account and the funds in her bank account were, in part, derived from the successor business's account, the panel concluded Chui could trace his partnership interest to Wong's real estate. Id.

Here, Ferris's and MJK's interests did not merge into an indistinguishable mass of interests across all of MJK's cash and cash equivalents. Ferris deposited the cash collateral into a particular account, MJK's DTC account. MJK's DTC account is the only asset in which Ferris's and MJK's interests merged into an indistinguishable mass. Even under Chui, we look only to the DTC account to determine if Ferris can trace the cash collateral to property currently in MJK's estate, the account in which Ferris's and MJK's interests merged.

Ferris cannot trace the cash collateral to property currently held by MJK's estate. On the day Ferris transferred the cash collateral, MJK disbursed more money from the DTC account than had been deposited. At the end of the business day, MJK's DTC account possessed a negative balance. Because MJK's DTC account held a negative balance at the end of day, the "lowest intermediate balance" on the account was zero. Therefore, no property existed upon which a court could impose a constructive trust, and MJK could not have used the cash collateral to acquire its cash or cash equivalents currently in MJK's estate.

Having concluded Ferris's constructive trust claim fails, we now consider MJK's contract claim. Ferris contends MJK defaulted under the MSL when it failed to pay Ferris $6 million to "mark to market," which required MJK to return the cash collateral. Ferris argues its interest was "substituted for the proceeds obtained by

MJK" to the extent MJK used the collateral after the breach. Assuming, without deciding, Ferris's interest in the proceeds of the cash collateral were substituted for MJK's interest, Ferris's claim fails because, as discussed above, Ferris cannot trace its cash collateral into any property of MJK's estate.

Because we conclude Ferris cannot trace the cash collateral to an interest in the property of MJK's estate, we need not consider the Trustee's powers under the strong-arm clause or the scope of customer property under SIPA.

## III. CONCLUSION

For the forgoing reasons, we affirm the district court's and the bankruptcy court's grants of summary judgment to the Trustee on Ferris's constructive trust and breach of contract claims.

_____