In re Michael J. LINDELL and Karen A. Lindell a/s/f Twin Silver, Inc., Debtors.

Dwight R.J. Lindquist, Trustee for the Chapter 7 Bankruptcy Estate of Michael J. Lindell and Karen A. Lindell, Plaintiff,

v.

JNG Corporation, Robert J. Weierke, and Twin Silver, Inc., Defendants.

Bankruptcy No. 04–41269.
Adversary No. 04–4353.

United States Bankruptcy Court, D. Minnesota.

Sept. 29, 2005.

Michael C. Mjoen, Eden Prairie, MN, for Debtors.

## MEMORANDUM OPINION AND ORDER

ROBERT J. KRESSEL, Bankruptcy Judge.

This proceeding came on for trial on August 15, 2005. Patrick B. Hennessy appeared for the plaintiff and William Nordstrom appeared for defendant JNG Corporation. This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334, and Local Rule 1070–1. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

### FACTUAL BACKGROUND

Twin Silver, Inc., a wholly owned corporation of Michael J. and Karen A. Lindell, owned and operated Schmitty's Tavern in Victoria, MN.[1] Twin Silver leased the real property and its improvements from the debtors.[2] In July 2003 the debtors and Twin Silver entered into an agreement to sell the business, the real property, and the building to Craig Glynn. Glynn later assigned his interest under the purchase agreement to Block One Hospitality, LLC. Under the agreement Block One paid $500,000.00 for the business, building and real property. The parties valued the

---

1. Although the parties stipulated that Twin Silver was a wholly owned corporation of both debtors, Michael Lindell testified at trial and in a deposition dated October 22, 2004 (Exhibit 22) that Karen Lindell was the sole stockholder.

2. Defendant Twin Silver, Inc. never responded to the trustee's complaint.

equipment, good-will and a non-compete agreement at $174,000.00 and allocated $326,000.00 to the real property.

The purchase of the building and real property closed on July 30, 2003. Block One paid the debtors $50,000.00 in cash and an additional $180,000.00 financed by Victoria Street, LLC., secured by a security interest in the equipment and a first mortgage on the real property. The balance of the purchase was financed by two promissory notes, one in the amount of $123,400.00 payable to Karen Lindell and one in the amount of $146,600.00 payable to Twin Silver. According to the promissory notes to both Karen Lindell and Twin Silver, Block One was to pay $1,265.00 and $1,485.00 respectively to the note holders at the beginning of each month. The Twin Silver note was secured by a security agreement on the equipment and both notes were secured by a mortgage on the real property second to that held by Victoria Street, LLC. Both notes include interest at the rate of 8%.

At some time shortly after the debtors and Twin Silver sold the property and the business to Block One, the debtors closed down Twin Silver's only bank account and liquidated Twin Silver. All payments on the notes went directly to Karen Lindell or Karen and Michael Lindell.

In November 2003, the debtors paid Nathan Neff $2,500.00 to find a new business for the debtors to acquire, but no business was ever located. In December 2003, Michael Lindell agreed to sell the notes from the sale of Schmitty's to JNG Corporation which is wholly owned by Neff. The sale closed on December 13, 2003. Under the terms of the sale, JNG paid $50,000.00 to Carver County Abstract and Title Company which handled the closing. Karen Lindell executed an assignment of the second mortgage to JNG and received $48,955.00 after reductions for closing costs. Between December 13, 2004 and March 10, 2004, Michael Lindell lost all the money gambling. The debtors filed a case under Chapter 7 on March 10, 2004.

At the time of the sale of the notes to JNG, the unpaid balance owed on the notes totaled $263,398.10. The property securing the notes was worth $339,000.00. JNG held the notes for five months and received payments on the notes each month that totaled $4,533.40. JNG retained $2,750.00 and paid $1,783.40 to Victoria Street LLC. as payment on the first mortgage. JNG netted $13,750.00 from December 2003 through May 2004.

In early May 2004, JNG sold the notes for $71,389.00 and assigned the second mortgage to Robert J. Weierke. Weierke is an associate of Michael Lindell whom he has known as a patron of Schmitty's for many years. Weierke has also loaned Michael Lindell money at various times over a period of fifteen years. Neff testified that Michael Lindell coerced him into selling the notes to Weierke and that he believed the notes to be worth more than the sale price.[3] Weierke loaned Michael Lindell $20,000.00 on the day of the sale and an additional $10,000.00 two weeks later. Michael Lindell had made no payments on the loans from Weierke as of April 7, 2005.

The trustee initiated this adversary proceeding on December 16, 2004 seeking to avoid the transfer of the notes and the second mortgage from the debtors to JNG pursuant to 11 U.S.C. § 548 and to recover the equivalent value of the property under 11 U.S.C. § 550. The trustee settled his claims against Robert J. Weierke and filed

---

3. Neff asserts that Michael Lindell threatened him "with a gun to his head" if he did not sell the notes to Weirke.

a stipulation of dismissal on August 9, 2005. The terms of the settlement with Weierke are not part of the record.

## DISCUSSION

### *The Corporate Entity*

The trustee claims that the debtors operated Twin Silver, Inc. as an alter ego and ignored corporate formalities. He seeks declaratory judgment that Twin Silver's note was actually property of the debtors when it was transferred to JNG on December 13, 2003.

■■■ It is state law that governs the extent of the debtor's interest in property. *Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 371 F.3d 397, 401 (8th Cir.2004); *N.S. Garrott and Sons v. Union Planters Nat'l Bank (In re N.S. Garrott and Sons)*, 772 F.2d 462, 466 (8th Cir.1985). "Once that determination is made, federal bankruptcy law dictates to what extent that interest is property of the estate." *N.S. Garrott and Sons*, 772 F.2d at 466.

■■■ The Minnesota Supreme Court has articulated a two-prong test to determine when a shareholder can be liable for corporate obligations. *Barton v. Moore*, 558 N.W.2d 746, 749 (Minn.1997). The first prong focuses on the shareholder's actions with regard to the corporation. Factors considered include: a failure to observe corporate formalities, absence of corporate records, and whether the existence of the corporation is merely a facade for individual dealings. *Victoria Elevator Co. of Minneapolis v. Meriden Grain Co., Inc.*, 283 N.W.2d 509, 512 (Minn.1979). The second prong requires that the moving party show that piercing the corporate veil is necessary to avoid injustice or fundamental unfairness. *Id.* To prove the second prong, it is sufficient to show that the corporation has been operated as a constructive fraud or in an unjust manner. *West Concord Conservation Club v. Chilson*, 306 N.W.2d 893, 898 fn. 3 (Minn.1981).

■■■ The debtors disregarded formalities and maintained Twin Silver as a facade for individual dealings. Michael Lindell testified at trial and the parties stipulated that the debtors commingled personal and business funds and used Twin Silver funds to pay personal expenses. It would be fundamentally unfair to find that the note in question was not held by Twin Silver solely for the benefit of the debtors. I find that the debtors operated Twin Silver as an alter ego for their personal dealings and therefore the Twin Silver Note was the debtors' property on December 13, 2003 when the debtors transferred it to JNG.

### *Fraudulent Transfer*

■■■ The trustee seeks to avoid the December 13, 2004 transfer of the notes to JNG pursuant to 11 U.S.C. § 548. Section 548 of the Bankruptcy Code provides in pertinent part:

(a) (1)The trustee may avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily (B)(i) received less than a reasonably equivalent value in exchange for such transfer ... and (B)(ii)(I) was insolvent on the date that such transfer was made or became insolvent as a result of such transfer.

Whether a transfer is made for reasonably equivalent value is a question of fact. *Jacoway v. Anderson (In re Ozark Rest. Equip. Co.)*, 850 F.2d 342, 344 (8th Cir. 1988). Reasonably equivalent value depends on the market conditions faced by a willing seller and a willing buyer, and not the financial demands of the seller. *Id.* at

345. The debtors sold the notes to JNG on December 13, 2004 and filed bankruptcy on March 10, 2004, well within the one year specified in the statute.

### Insolvency

The debtors were insolvent at the time of the transfer of the notes to JNG. "Insolvent" is defined as a:

> financial condition such that the sum of such entity's debts is greater than all of such entity's property at a fair valuation, exclusive of (i) property transferred, concealed, or removed with intent to hinder, delay or defraud such entity's creditors; and (ii) property that may be exempted from property of the estate under section 522 of this title. 11 U.S.C. § 101(32)(A).

The debtors schedules indicate that at the time of filing they were insolvent. They indicate that they had total assets of $26,012.00 and claimed exemptions of $8,010.00. The debtors' total liabilities amounted to $147,345.00 which included $18,711.00 in secured claims, $2,730.00 in priority claims and $125,904.00 in unsecured claims. The difference between non exempt assets of $18,002.00 and liabilities of $147,345.00 clearly demonstrates insolvency at the time of filing.

The debtors were also insolvent months earlier when they sold the notes. After the sale of Schmitty's to Block One, the payments from the notes constituted the debtors' main source of income. When they sold the notes to JNG in December 2004, they lost that source of income. Michael Lindell's other source of income came from gambling professionally by counting cards. This profession however, did not provide him with a positive cash flow. Michael Lindell testified that he lost $6,000.00 more than he made not including travel expenses in the year and two or three months he did this full time. He estimated his travel expenses to amount to between $5,000.00 and $10,000.00 when he quit in February or March of 2004. Karen Lindell also worked part time as a waitress, but made minimal income.

Michael Lindell estimated that he and Karen Lindell had approximately $100,000.00 in unsecured debt in December 2003 and his debts continued to increase until March 10, 2004. The debtors' schedules combined with Michael Lindell's testimony indicate that the debtors were insolvent in December 2003 at the time of the transfer of the notes. Certainly they were insolvent after the transfer.

### Reasonably Equivalent Value

■ In the Eighth Circuit, the issue of whether a transfer was made for reasonably equivalent value is a question of fact. *Jacoway,* 850 F.2d at 344. In order for the trustee to prevail on a claim under 11 U.S.C. § 548(a)(1)(B) he must show that the notes were not sold for reasonably equivalent value. *Pummill v. Greensfelder, Hemker, & Gale (In re Richards & Conover Steel, Co.),* 267 B.R. 602, 612 (8th Cir. BAP 2001). This requires an analysis of whether (1) value was given; (2) it was given in exchange for the transfer; and (3) what was transferred was reasonably equivalent to what was received. *Meeks v. Don Howard Charitable Remainder Trust (In re Southern Health Care of Ark., Inc.),* 309 B.R. 314, 319 (8th Cir. BAP 2004).

■ The payment of money from one entity to another is the giving of value for the purposes of Section 548. See 11 U.S.C. § 548(d)(2)(A) (defining value as property, or satisfaction or securing of a present or antecedent debt of the debtor). A transfer is in exchange for value if one is the quid pro quo of the other. *Pummill,* 267 B.R. at 612.

The debtors sold the notes to JNG for $50,000.00. At the time of the sale, the balance due on the notes was $263,398.10 and from July 30, 2003 until December 13, 2004 Block One had timely made all payments. At trial Neff indicated that he would not have paid any more than $50,-00.00 for the notes based on his assessment of the tavern as an operating business. He indicated many flaws in the tavern's business, including its impending loss of the pull tabs business. Neff's conclusion of the notes' combined value may stem from a misunderstanding of what secured the notes. The notes were not secured by the business, but rather by the real property and the equipment.

The trustee presented testimony of an expert witness. The expert valued the notes in a range between $120,000.00 and $130,000.00 on December 13, 2004 based on the face value of the notes, the interest rate, and the collateral. The business's viability did not affect his valuation of the real property which served as collateral for the notes. He also indicated that his valuation could have been higher if, at the time he made the assessment, he had information on Block One's financial condition.

Based on the assessment made on the value of the notes from the trustee's expert, the knowledge that the borrower has made all payments on the notes to the date of trial, and all other circumstances surrounding the sale, I find the value of the notes to have been $130,000.00 on December 13, 2003. It is clear that value was given and it was given in exchange for the transfer.

 The only issue left is whether the transfer of notes worth $130,000.00 in exchange for $50,000.00 in cash was for reasonably equivalent value. Fair market value is the benchmark for determining reasonably equivalent value outside of foreclosure. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). Whether reasonably equivalent value has been given in the sale of property is a question of fact. *Jacoway*, 850 F.2d at 344. When evaluating a transfer for reasonable equivalency under 11 U.S.C. § 548(a)(1)(B)(i) a court must examine the entire situation. *Jacoway*, 850 F.2d at 344–345.

The Bankruptcy Code does not define reasonably equivalent value. The Uniform Fraudulent Conveyance Act uses the term "fair consideration." Under UFCA fair consideration is given for property or an obligation: [4]

(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

(b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained. UFCA § 3

Historically, some courts approached a determination of reasonably equivalent value mathematically. See *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201 (5th Cir. 1980) (In dicta, the court held that less than 70% of fair market value is not reasonably equivalent value). This approach has since been abandoned in favor of an approach that reviews the factors in each individual case.

 There is no bright line rule used to determine when reasonably equivalent value is given. See *Jacoway*, 850 F.2d at 345 (indicating that a determina-

---

**4.** Reasonably equivalent value under the Bankruptcy Code does not have a good faith requirement like that which appears in UFCA's fair consideration definition.

tion of reasonably equivalent value is based on a "totality of the circumstances"); *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir.1997) (Stating that the standard for reasonable equivalence should depend on all the facts of each case). The important elements to consider are (1) fair market value and (2) whether there was an arm's length transaction. *Id.* See *Cooper v. Ashley Communications, Inc., (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 467 (4th Cir.1990) (Adopting a totality of the circumstances test for reasonable equivalence). A determination of reasonably equivalent value is "fundamentally one of common sense, measured against market reality." *In re Northgate Computer Sys., Inc.*, 240 B.R. 328 (Bankr. D.Minn.1999).

■ In considering the totality of the circumstances in the present case, it is clear that JNG did not pay reasonably equivalent value for the notes in December 2003. The remaining balance on the notes at the time of the transfer was $263,398.10. Block One remained current on its payments from August 2003 until December 2003 when the debtors sold them to JNG. Most importantly, the debtors sold the notes whose value was $130,000.00 to JNG in December 2003 in an arm's length transaction for $50,000.00. In other words, JNG paid 38.5% of the notes' combined value at the time of their purchase. Even Neff, JNG's principle, stated that his sale of the notes for $71,000.00, five months after he purchased them and collected five months of payments, was for less than a fair price. In considering the totality of the circumstances the December 13, 2004 transfer was not for reasonably equivalent value and therefore the transfer of the notes to JNG is avoidable.

The trustee also argued that the December 13, 2003 transfer was avoidable pursuant to 11 U.S.C. § 548(a)(1)(A) because it was made with the intent to hinder, delay, or defraud creditors. I do not address this argument because the transfer is avoidable for the reasons stated above.

### Recovery for the Bankruptcy Estate

■ The trustee seeks recovery of the value of the property transferred pursuant to 11 U.S.C. § 550. Section 550 determines from whom the trustee may recover property whose transfer is avoided pursuant to 11 U.S.C. § 548. Section 550(a) allows the trustee to recover from any initial transferee or any immediate transferee of the initial transferee the property transferred or the value of that property. 11 U.S.C. § 550(a)(1,2); *Sherman v. Third National Bank*, 67 F.3d 1348, 1356 (8th Cir.1995). JNG was the initial transferee of both notes.

The trustee may avoid the transfer except to the extent of the amount that JNG already paid to the debtors pursuant to 11 U.S.C. § 548(c). Section 548(c) states:

a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer.

In this case JNG paid $50,000.00 cash in exchange for the notes and paid in good faith so it may retain the interest it gave to the debtor in exchange for the transfer. In other words the trustee may collect from JNG the value of the notes less the $50,000.00 it paid to the debtors, or a net of $80,000.00.

Section 550(d) entitles the trustee to only a single satisfaction under Section 550(a). The trustee settled his claims against Robert J. Weierke. Presumably the settlement involved a payment to the

trustee by Weierke. The trustee may only collect from JNG that amount which he has not collected from Weierke pursuant to 11 U.S.C. § 550(d).

## ORDER

THEREFORE, IT IS ORDERED:

1. The debtors' transfer to defendant JNG Corporation of the notes dated December 13, 2004 is void.

2. The plaintiff shall recover from defendant JNG Corporation the sum of $80,000.00 plus costs of $150.00 for a total of $80,150.00, less any amounts he recovers from defendant Robert J. Weierke.

LET JUDGMENT BE ENTERED ACCORDINGLY.